**UNITED STATES of America,**
**Plaintiff,**

**v.**

**GENERAL DYNAMICS CORPORATION,**
**Defendant.**

United States District Court
S. D. New York.

July 28, 1965.

Bernard M. Hollander, Robert W. Tobin, Allen E. McAllester, Washington, D. C., for the United States.

Cravath, Swain & Moore, by Bruce Bromley, George B. Turner, Allen F. Maulsby, Robert Rosenman and Christo-

pher D. Stone, New York City, for defendant.

CANNELLA, District Judge.

Motion by the defendant, General Dynamics Corporation, made at the conclusion of the government's case, pursuant to Rule 41(b) of the Federal Rules of Civil Procedure, to dismiss the plaintiff's action "on the ground that upon the facts and the law the plaintiff has shown no right to relief" was denied in all respects by this court on April 9, 1965 for the reasons hereinafter set forth.

## THE CHARGE

This is a civil anti-trust action brought by the United States alleging that the defendant has acted in violation of Section 1 of the Sherman Act, 26 Stat. 209 (1890), as amended, 15 U.S.C. § 1 (1958) and Section 7 of the Clayton Act, 38 Stat. 731 (1914), as amended, 15 U.S.C. § 18 (1958). Specifically, the plaintiff complains that the merger of the defendant with Liquid Carbonic Corporation on September 30, 1957 may have the effect of substantially lessening competition or tending to create a monopoly in the manufacture, distribution and sale of carbon dioxide, in violation of Section 7 of the Clayton Act. In addition, the government asserts that the effect of a special sales program, established and implemented by the defendant, is to restrain trade and commerce in violation of Section 1 of the Sherman Act.

The government seeks divestiture by the defendant of its now Liquid Carbonic Division and injunctive relief prohibiting the defendant from further use of its special sales program or any other device designed to accomplish the same asserted proscribed aims.

## BACKGROUND

General Dynamics Corporation was founded in 1952 and has grown in stature to a place among the leaders of American industry. It acquired Electric Boat Company, and its subsidiary Canadair Limited thus entering fields primarily concerned with the national defense. Electric Boat was a private producer of submarines and its subsidiary was involved in aircraft manufacture. This acquisition was effected on April 25, 1952. Thereafter followed a chain of acquisitions by the defendant bringing within their corporate entity such companies as Consolidated Vultee Aircraft Corporation (Convair) (1954), Stromberg-Carlson Company (1955), Liquid Carbonic Corporation (1957) and Material Service Corporation (1959).[1] In short, due to these acquisitions and an expanded volume of business conducted (primarily with the United States and Canadian Governments), General grew to the point where it now occupies a high echelon in this country's corporate hierarchy.

In 1957, at the time of the merger, Liquid Carbonic Corporation maintained a position as the largest domestic producer of carbon dioxide. Despite its preeminent position in the industry, Liquid had failed to show any increase in sales volume in the period prior to the merger. From documents in evidence, discussed *infra,* the lack of further growth was apparently ascribed by Liquid to a deficiency in its sales force and their techniques.

Therefore, the situation before this court, most particularly insofar as the § 7 charge is concerned, involves the consolidation of a diverse corporation of unquestioned size with a company of smaller absolute scope, but of substantial size and at the time, the leader in its field.

## DISCUSSION

At the outset, the court will note the procedure that is to be used in presentation of this memorandum. This statement by the court is designed to indicate its reasons for the decision of April 9. At the writing of this memorandum, the court is aware that the defendant will present its case sometime during the ensuing summer. Thus for its benefit and also for that of the plaintiff-govern-

1. The enumeration of acquired entities does not indicate certain smaller companies acquired during the same period.

ment's the court will undertake the task of evaluating the evidence presented in light of the applicable law.

■ The procedure the court will employ will necessarily differ from that which would be required of it were the motion to have been granted. Were the latter to have occurred, the court would be obliged to make findings of fact and conclusions of law. Rule 41(b), F.R.C.P.; see also Rule 52(a), F.R.C.P. Full findings will of course be made at the close of all the evidence. While the court's ruling on the defendant's motion must of necessity be substantiated here, the function of the court, at this point in the litigation, is to indicate its legal reasoning and to highlight the evidence which supports it. Thus no complete and detailed examination of the evidence is here contemplated.

■ Before proceeding to consideration of the asserted violations, it would be well to consider the framework in which the motion to dismiss is considered. The motion made by the defendant in accordance with Rule 41(b) is the procedural equivalent of a motion for a directed verdict in a jury case. See 5 Moore's Federal Practice ¶41.13 [4]; 2B Barron & Holtzoff Federal Practice and Procedure § 919. Though designed to accomplish the same result, the standards for decision are significantly different. In a jury action, on a motion for a directed verdict, the court should consider the evidence in a light most favorable to the plaintiff and accord all favorable inferences. The motion may be granted only if the evidence is insufficient to establish relief for the plaintiff, as a mattter of law. See O'Brien v. Westinghouse Electric Corp., 293 F.2d 1 (3d Cir. 1961). In an action tried to the court sitting without a jury, the court weighs the evidence and considers the

law. But in this context, the motion may be granted even though the plaintiff has made out a prima facie case. Huber v. American President Lines, 240 F.2d 778 (2d Cir. 1957). The court must view the evidence with an unbiased eye, without any attendant favorable inferences. The evidence must be sifted and balanced and given such weight as the court deems fit. See Allred v. Sasser, 170 F.2d 233 (7th Cir. 1948). Against this background, the court will now proceed to consideration of the charges themselves.

### SECTION 7 OF THE CLAYTON ACT

Although the allegation of a § 7 violation appears as the second offense in the government's complaint,[2] the court will treat this matter in the first instance. In view of the prayer for relief in relation to this charge, to wit, divestiture of the Liquid Carbonic Division of the defendant, the § 7 charge is of primary importance. For a violation of section 7[3] to be established, the government must basically prove three elements contained in the statute. Two of the three elements have been agreed to by stipulation of the parties.[4] The parties have stipulated that "the manufacture, distribution and sale of carbon dioxide in the United States (excluding Alaska and Hawaii) is a 'line of commerce' in a 'section of the country', as those terms are used in Section 7 of the Clayton Act." Thus the function of the court is narrowed to a determination of whether the acquisition in question may have the effect of substantially lessening competition or tending to create a monopoly as those terms are used in the statute and consistent with the interpretation given them by the relevant case law.

■ The court is faced here with a merger which is neither the traditional vertical or horizontal one but which as a conglomerate merger is nevertheless

---

2. Paragraphs 14, 15 and 16.

3. "No corporation engaged in commerce shall acquire * * * the stock * * * of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or tend to create a monopoly."

4. GX 176. References are to Government Exhibits in Evidence.

within the purview of § 7. Brown Shoe Co. v. United States, 370 U.S. 294, 317, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). See also F. T. C. v. Consolidated Foods Corp., 380 U.S. 592, 601, 85 S.Ct. 1220, 14 L.Ed. 2d 95 (April 28, 1965), concurring opinion of Mr. Justice Harlan. Despite the fact that the situation before the court, insofar as its reciprocity aspects were concerned, was novel at the time this court decided the defendant's motion to dismiss on April 9, the Supreme Court in F. T. C. v. Consolidated Foods Corp., supra, has indicated guidelines to be followed in a case of this sort. This court in denying the motion relied upon an analysis of the existing case law, in determining that the government's evidence indicated a violation of § 7. That conclusion has been buttressed by Consolidated Foods and while this discussion will, in the main, be geared toward the guidelines laid down there, consideration of the general principles announced in prior § 7 cases will also be made.

■ While the defendant has contended that a reciprocal dealing arrangement is not violative of § 7, it is clear now that within certain limitations, the opportunity for reciprocity can indeed subject the defendant to the sanctions of the Act. "We hold at the outset that the 'reciprocity' made possible by such an acquisition is one of the congeries of anticompetitive practices at which the antitrust laws are aimed." F. T. C. v. Consolidated Foods Corp., supra, at 594, 85 S.Ct. at 1221. Thus reciprocity results in "an irrelevant and alien factor" injected into the market situation. F. T. C. v. Consolidated Foods, supra, at 594, 85 S.Ct. 1220.

■ It is thus apparent to the court that the applicable rule in a case such as this is that an acquisition which makes reciprocity in trading possible violates

§ 7 if the probable consequence of the acquisition is to lessen competition through the use of leverage in one field or another. F. T. C. v. Consolidated Foods Corp., supra. The government's case should thus be examined at this stage to see if the acquisition by the defendant of Liquid Carbonic Corporation was such as to make reciprocity in trading possible. If that is found, then the record must be screened to determine whether, were the reciprocity to be exercised, it would result in a probability of a substantial lessening of competition. It is the court's finding that both elements have been met and on the evidence as presented, the court cannot state that the plaintiff has not shown a right to relief.

■ The market structure in existence at the time of the merger leads to the conclusion that the acquisition which occurred in the instant case made reciprocity in trading possible. General Dynamics, as noted previously, was a multi-division corporation dealing primarily with the United States and Canadian governments. It thus required supplies from sundry private companies to produce the finished product it delivered. On the other hand, Liquid Carbonic Corporation sold its product to a private market, something that the defendant corporation lacked on a large scale. The industries involved were of course of a different nature. General's sales to the governments were of largely defense items, such as submarines and aircraft. Liquid sold carbon dioxide to its customers.[5] Without delineating the numerical figures involved,[6] suffice it to say that the defendant itself estimated that at least 75% of its suppliers were potential users of Liquid's wares.[7] It is obvious to the court that where a corporation such as the defendant acquires another entity which produces a product

---

5. It is of course true that Liquid Carbonic Corporation deals in the general field of industrial gases. As far as the § 7 discussion is concerned, however, carbon dioxide has been stipulated as the "line of commerce".

6. The record is replete with statistical information on the number of supplier-customers involved and the amount of business, by dollar volume and percentage, which could be affected.

7. GX 42.

it can sell to its suppliers, the opportunity for reciprocity exists. The number of supplier-customers is irrelevant at this point. It is sufficient at this juncture in the discussion to note that at the time the merger was consummated certain supplier-customer relationships existed, while others could be anticipated. The size of each of the parties, the amount of business involved, the market positions and the degree of concentration in the industry are matters to be viewed in determining the effect which any expected exercise of the latent power might produce.

 It is interesting to mention that the merging parties were acutely aware of the opportunity for reciprocal dealing should their merger take place. Of particular note is a report [8] by R. L. Nicholson, President of Liquid Carbonic Corporation at the time of the merger.[9] At page 8 of the report Nicholson stated:

> If my information is correct, Liquid's management would have at its disposal the entire purchasing power of General Dynamic's other Divisions *for reciprocal business purposes*. During this period of rapidly increasing competition and recognizing that Liquid's sales force is woefully weak, *the advantage of this reciprocity* would be of unlimited value in getting a load on our plants both old and new. * * * If, *through reciprocity*, we could put a load on all our plants on a year-round basis, our earnings would rise very rapidly. (Emphasis supplied).

Although evidence of the purpose of the merging parties is relevant in attempting to determine the probable effects of the merger (Brown Shoe Co. v. United States, supra, 370 U.S. at 329, 82 S.Ct. 1502; United States v. Aluminum Company of America, 233 F.Supp. 718 (E.D. Mo.1964)), reference is made to the above

report here to indicate the awareness of at least one of the merging parties of what would be a business reality once the resulting corporation was formed.

In addition, the actions of the defendant once the merger was effected lends credence to the proposition that this merger resulted in the opportunity for reciprocity. Within a short period of time following the merger, the defendant inaugurated a program, known as the Special Sales Program. Though it has been characterized by the defendant as a program designed to make the best possible use of "trade relations" with other business concerns, it is apparent, that no matter what its label, the program was put into operation to make use of the opportunity for reciprocal trading which existed. Again the technicalities of operation of the program or the results which accrued from it are not of importance here. But the accounts designated in the program were those in a supplier-customer relationship with the defendant. The purpose of the program was to approach the accounts on a different basis, the obvious import of which leads the court to believe that the defendant was well cognizant of the power it possessed.

 The government's proof has established the existence of naked reciprocity to the satisfaction of the court. The court now proceeds to a consideration of the effect which any exercise of the reciprocity might have, viewed both as of the time of the merger and by what transpired after the acquisition. This of course is the problem of whether the merger would result in a probability of a substantial lessening of competition. Since "the force of § 7 is still in probabilities" (F. T. C. v. Consolidated Foods Corp., supra, 380 U.S. at 598, 85 S.Ct. at 1224), the point of merger, looking toward the future, is the locus of original examination.

8. GX 16.

9. Nicholson later became operating head of the defendant's Liquid Carbonic Division and an executive vice-president of

the defendant. It is apparent to the court that his views as to the possible benefits of the merger have an authoritative ring.

To reiterate, the point of departure is an examination of the market conditions in existence at the time of the merger. An initial perusal of the size of the parties is of course important. See Brown Shoe Co. v. United States, supra, 370 U.S. at 331, 82 S.Ct. 1502. In 1957, the year of the merger, the defendant's net sales totaled $1,562,539,900, ranking twentieth among domestic corporations.[10] In view of later figures and the proportional relation which they bear,[11] the defendant's purchasing power in 1957 was over $500,000,000. At the time of the merger, Liquid Carbonic Corporation was the "largest domestic producer and distributor of gaseous, liquid and solid carbon dioxide, presently accounting for 35% to 40% of the total available market."[12] Liquid's net sales in 1956 totaled over $35,000,000.[13] The statistical breakdown indicates that over $18,000,000 of the sales can be attributed to carbon dioxide.[14]

While the more normal vertical or horizontal merger would lend itself to a complete examination into the market positions of both the merging parties, the factor of prime importance in this conglomerate case is the relative market position of the acquired company, Liquid Carbonic Corporation. See F. T. C. v. Consolidated Foods Corp., supra, 380 U.S. at 600, 85 S.Ct. 1220. In light of the evidence presented, Liquid's share of the carbon dioxide market ranged from 27.3% to 40% of the market at the time of the merger.[15] These figures are of interest in light of the factual situations in other § 7 cases.[16] No implication is intended that the court need go no further than to recite the market share of

Liquid, to place its stamp of approval on the government's proof. However, al-prior to Consolidated Foods involved ver-prior to Consolidated Foods involved vertical[17] and horizontal mergers, the relevant market position of the acquired company is relevant here to determine if the merger is of such a size to bring it within the purview of § 7.

A brief remark concerning the degree of concentration in the carbon dioxide market is in order. This is of course important in examining a § 7 charge, although again of more vital importance in a horizontal merger. See United States v. Aluminum Company of America, 377 U.S. 271, 84 S.Ct. 1283, 12 L.Ed.2d 314 (1964); United States v. Philadelphia National Bank, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963); Brown Shoe Co. v. United States, supra. At the time of the merger, the leading four companies in the carbon dioxide field controlled approximately 75% of the market, with Liquid and Air Reduction Company accounting for 60% of the total.[18]

The merger in question here, in the view of the court, created a probability that were reciprocity to be exercised by the defendant it would result in a substantial lessening of competition. The defendant had approximately 80,000 suppliers,[19] a sufficient number of whom, as the evidence indicates, used products of the type sold by Liquid. The court need not present exact mathematical calculations at this stage of the litigation to indicate the amount of business which could be foreclosed. Taking into consideration the dollar volume of Liquid's sales and General's purchases, the market

10. GX 177 ¶¶ 4, 5 and 6.

11. GXs 10, 11 and 12.

12. GX 15B.

13. Ibid.

14. GX 177 ¶ 10(a).

15. See GXs 15A, 15B, 18 and 177 ¶ 10 (a).

16. See United States v. Philadelphia National Bank, 374 U.S. 321, 83 S.Ct. 1715,

10 L.Ed.2d 915 (1963); Brown Shoe Co. v. United States, supra.

17. Mention should be made of the vertical aspect of the merger, to wit, the foreclosure of competition as to the defendant's carbon dioxide purchases. See GX 177 (¶ 19).

18. GX 15A, page 4032.

19. GX 70.

share of Liquid, and the probable amount of supplier-customers involved, the leverage that could come into play is apparent. It is the court's view, from the evidence presented, that the probable consequences of the merger, viewed from the point of the acquisition, is to create extensive leverage, that is, the probability of a substantial lessening of competition.

In Consolidated Foods, the Supreme Court noted that although "[T]he Court of Appeals was not in error in considering * * * post-acquisition evidence * * * we think it gave too much weight to it." 380 U.S. at 598, 85 S.Ct. at 1224. That caveat applies with equal force to this court. The court is of course in a more advantageous position where it has evidence after the acquisition to consider. For the probabilities which are of necessity not of the utmost clarity at the time of merger, can come more sharply into focus by what has occurred thereafter. While giving weight to the defendant's statistical argument in this case, that reciprocity has failed (at least by the government's proof), it is the court's feeling that the evidence adduced of the defendant's post merger conduct and the repercussions flowing from it confirm, rather than rebut, the conclusion reached by this court. In general terms, this involves the establishment of an organized program to effect the naked reciprocity present and the results of the program, as well as statistical information concerning the relative positions of the defendant and the now Liquid Carbonic Division.

With some degree of dispatch following the acquisition in 1957, the defendant established a program, known as the Special Sales Program.[20] While the defendant has disputed the purpose and character of the program, basically claiming it to be one designed to best make use of advantageous "trade relations",[21] the evidence indicates that the purpose was to attempt to effectuate the opportunity for reciprocal dealing made possible by the merger.[22] The accounts designated "SSP Accounts were those companies in a supplier-customer relationship with the defendant [23]—those upon whom the approach of desirable reciprocal trading might be used. Indeed, internal memoranda circulated among the divisions of the defendant and other documents such as agendas for meetings display clearly that the defendant itself knew the Special Sales Program was designed to exercise reciprocity.[24]

The proof submitted by the government as to the nature and purpose of the Special Sales Program is largely composed of memoranda and documents of the defendant's personnel in charge of the program. Again without a precise detailing of the exhibits in evidence, it is sufficient to say that the evidence introduced indicates a purposeful motive by the defendant to take advantage of its newly found position. Some comments should be made about the typical functioning of the program.[25] It was designed to approach high level executives of the supplier-customers, rather than ordinary low-level dealing with purchasing agents. The program head and others in his top echelon made personal visits to these companies to arrange for contact on the higher level. The inference is clear that to by-pass the purchas-

20. For documents dealing with the program see generally GXs 28–80.

21. In GX 84 entitled "SSP Closing Remarks" the following statement appears at page 2 " * * * and, as you know, SSP stands for Special Sales Program accounts. This phrase is adopted to substitute *for the less desirable term of reciprocity* * * *" Emphasis supplied.

22. As C. Rhoades MacBride stated in GX 41: "As you probably know, there has been considerable work underway to aid the Liquid Carbonic sales picture via General Dynamics *reciprocity leverage*." Emphasis supplied.

23. See GXs 7–12 and GX 71 (sample cards in evidence only).

24. See e.g. GXs 28 (at page 3 ¶ 7), 34, 35, and 36.

25. See generally GX 97.

ing agent—seemingly solely concerned with price, quality and service—and to go above his head, was designed to accentuate an element the purchasing agent either could not, would not, or was not able to appreciate—the existence of the supplier-customer relationship and the advantages of reciprocal trading.[26]

The numerous visits by the heads of the Liquid Division are detailed in the evidence. There is of course no indication in the record that any attempt was made to browbeat any individual supplier-customer into continuing, increasing or originating purchases from the Liquid Carbonic Division. However, it would be naive to assume that the only way to effectuate this program in a successful manner would be the "tough line" approach. Business reality indicates the latter would be the least desirable method. The defendant is not to be rewarded or excused here for the very astuteness of their corporate thinking. For Consolidated Foods clearly recognized that "[R]eciprocal trading may ensue not from bludgeoning or coercion but from more subtle arrangements." 380 U.S. at 594, 85 S.Ct. at 1222. These words have highly pertinent meaning here.[27] For the evidence adduced up to this point leads to the conclusion that the indicated purpose of the Special Sales Program in conjunction with the methods used in its day to day operations, was designed to implement the opportunity for reciprocal trading made possible by the 1957 acquisition.

The post acquisition evidence in the instant case is not restricted to the mere organization and implementation of the Special Sales Program. The results of the program are in evidence and some discussion is of value now. The first, and most revealing, indication of the results of the program is the plethora of statements and memoranda made by General officials concerning the program, which have been introduced into evidence.[28] The defendant's officials were acutely aware, not only of the success already enjoyed, but of the opportunity for greater achievement in the future.[29]

The statistical data submitted by the regional sales offices, compiled from reports of individual salesmen, gives some indication of the amount of business obtained through the Special Sales Program.[30] The defendant has disputed the value of the data submitted based on a claim that the reports are the product of some exaggeration by the local representatives, assertedly eager to display their sales efficiency. The argument is without force. The reports were made as a regular accounting by the local men in the field and although some modifications of the figures might conceivably be in order, the reports are credible to the court. The entire range of statistical information submitted shows that by 1962, the defendant's sales of carbon dioxide to about 330 companies designated as "SSP Accounts" had reached $3,542,-888.[31] No claim is made that this volume of business was newly acquired through the Special Sales Program. But even were the sales merely retained through the use of reciprocity, the evidence is sufficient to display a measure of success

---

26. "Then when this information has been procured, the Chicago staff, along with the Regional General Manager, comes to some conclusion as to who should make the initial contact. As you know, this should be made with the President of the concern or the Vice-President in Charge of Sales. These individuals are usually quite happy and willing to spend some of their money where they themselves are getting an appreciable volume of business. There are enough concerns who are willing to do this on a voluntary basis to make it unnecessary to compel any one to do this which, of course, would

spell trouble. When these contacts have been made and after several calls, which are invariably required, some business for us will result." GX 84, pages 2–3.

27. See GX 123 at page 3.

28. See generally GXs 69, 84, 93, 160 and 161.

29. See e.g. GXs 93 and 160.

30. See GXs 124–157.

31. See GX 162. The figure was approximately 17.3% of General's annual carbon dioxide sales.

not of so slight a degree as to be ignored. See F. T. C. v. Consolidated Foods, supra, at 599–600, 85 S.Ct. 1220.

The defendant's assertion of failure of the program [32] is not justified by the evidence. The decline in Liquid Carbonic Corporation's market share in the 1954–57 period preceding the merger was at least effectively halted. In fact, the Liquid Carbonic Division's share of the market in each year subsequent to the acquisition is greater than that of the Liquid Carbonic Corporation in the year of the merger.[33] See F. T. C. v. Consolidated Foods, supra at 599, 85 S.Ct. 1220. Viewed in light of the strongly competitive carbon dioxide industry, the evidence indicates that the implementation of a system designed to effectuate the opportunity for reciprocity present following the acquisition was effective. As previously noted, the post acquisition evidence supports the conclusion, heretofore stated.

An examination of all the evidence submitted at this juncture of the litigation indicates that the probable effect of the 1957 acquisition is to substantially lessen competition in the carbon dioxide industry in the United States (excluding Alaska and Hawaii). On the evidence presented, the court cannot say that insofar as the Section 7 allegation is concerned, the plaintiff is not entitled to relief.

## SECTION 1 OF THE SHERMAN ACT

While the evidence must be considered in this part of the case in accordance with the principles applicable to an asserted violation of Section 1, much of what has previously been said is relevant here.

Thus, reference will be made at times, to prior and more complete discussions contained in the memorandum.

Once more the parties have narrowed the issues involved, here in regard to the charge of a violation of Section 1 of the Sherman Act [34] contained in paragraphs 11, 12, and 13 of the complaint. The parties have stipulated [35] that:

> General Dynamics, through its Liquid Carbonic Division * * * has shipped carbon dioxide and other industrial gases in interstate commerce from some of its plants or warehouse locations to various other States of the United States, including the Southern District of New York.

Thus the query is whether the conduct of the defendant has resulted in contracts in restraint of trade or commerce involving a not insubstantial amount of commerce.[36]

It would be well to first state what is not involved in this discussion. The court is not concerned here with all contracts of sale which were consummated by the Liquid Carbonic Division of the defendant. The government's claim of illegality is again based on the use of reciprocity. Thus to even dwell on contracts entered into with customers not in the relationship of supplier with the defendant would be a foolhardy gesture. No hint of pernicious conduct could be attached to these agreements.

The court, restricted as it is by the evidence presented and not concerned here with probabilities but actualities, cannot under the law and in good conscience consider all contracts entered into

---

32. Success or failure of the Special Sales Program is not the norm of decision here. Section 7 is couched in probabilities and the defendant is not entitled to "a 'free trial' period." See F.T.C. v. Consolidated Foods, supra at 598, 85 S.Ct. 1220.

33. See GX 177, ¶¶ 10(a) and 18.

34. § 1 provides in pertinent part: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce, among the sev-

eral States, * * * is declared to be illegal; * * *."

35. GX 177 ¶ 9.

36. Since no decision has yet been made on the informal motion of the government to conform pleadings to proof in regard to a claim that the merger is an illegal combination in violation of § 1, nothing contained in this memorandum is intended as a discussion of the merits of the allegation.

by the Liquid Carbonic Division with suppliers of the defendant's many divisions. It would stretch the imagination too far to muse that a customer not contacted on a reciprocity basis or designated as an account to be so approached entered into purchase agreements with the Liquid Carbonic Division in order to insure some measure of reciprocal rapport with the defendant. Inferences are valuable tools, but speculation is a practice uniformly condemned. The alleged vice under § 1 is the Special Sales Program designed to systematically contact supplier-customers on a high level basis and inject into any discussion the elements of reciprocal trading. If the defendant felt that a company's sales to it were of such minimal volume and monetary return that to approach them on the basis of reciprocity would smack of naivete or poor business judgment, it is far beyond the reach of this court to suggest that contracts of sale with companies of this class contained any element of reciprocal dealings. The government could not argue otherwise. The allegations in their complaint and their prayer for relief preclude any consideration of agreements with the class of firms noted above.[37]

Stripped down to its essentials, the charge of the government and the consideration of the court must be limited to agreements entered into with supplier-customers of the defendant approached on a reciprocity basis—the SSP accounts. Do these agreements violate § 1? Are these contracts in restraint of trade? The questions are answered by an examination of the purpose of the Special Sales Program, the legal nature of that purpose [38] and the logical and necessary results of the program.

No great elaboration is required here to discover the purpose of the Special Sales Program and the antitrust ramifi-

cations which must be attached to the purpose employed there. The discussion of the court on the § 7 charge is dispositive of these queries. It is clear to the court that the Special Sales Program was designed to take advantage of and effectuate the opportunity for reciprocity made possible by the merger. It is also abundantly clear that the purpose of the program, reciprocal dealing, is one of the "anticompetitive practices at which the antitrust laws are aimed" and "an irrelevant and alien factor" which may affect an otherwise unimpeded competitive choice. F. T. C. v. Consolidated Foods, supra at 594, 85 S.Ct. 1220, at 1221. A branch of the defendant's argument before this court has been that reciprocity is a normal and expected business practice without any aura of illegality surrounding it. Insofar as the generic status of reciprocity is concerned, Consolidated Foods silences any argument of *per se* legality.[39] Though this § 1 charge is a matter of first impression, the novel aspects concern the characterization and classification of the effects of reciprocity, not of its essential nature. The defendant cannot be heard here to defend reciprocity in principle as an economic reality with commensurate competitive value. It stands labeled as an anticompetitive device. The perusal here is of the legal effect of its widespread use insofar as § 1 is concerned.

 It is the court's view, from the evidence presented, that the agreements consummated by the defendant with its SSP accounts are proscribed by § 1 in that they contain implied reciprocity considerations. Some further delineation of the use of the Special Sales Program is in order, above and beyond the § 7 discussion.

As noted before, the record is replete with documents which display the me-

---

37. See ¶¶ 11 and 12 of the complaint and ¶¶ 5(a) (b) and (c) of the prayer for relief.

38. That is to say, is the additional element injected into these dealings one of economic value in promoting competition

or is it an element which is a pernicious one and one designed to fence out competition?

39. Of course it does not follow, however, that the use of reciprocity is *per se* illegal.

chanics of operation of the program. But more specifically here, the integrated system of high-level contacts resulted in the injection of reciprocity considerations into sales discussions. Precise examples are contained in the Jung diary, parts of which have been introduced into evidence.[40] Some of the comments are noticeably revealing. In recording his meeting with a Mr. Haney of Kirkhill Rubber Company, Jung states:

> Murray and I visited with Mr. Haney in the morning and discussed the relationship between Kirkhill and General Dynamics. Haney saw the picture immediately, called in the P. A., Mr. Atkinson and instructed him that if Liquid Carbonic could provide them with prices equal to those they are presently paying, future business should be given to Liquid. His exact words were "we like to do business with people who do business for us." [41]

The May 19 entry concerning Straza Corporation again is probative of the sales discussions which occurred. Jung noted that one Russell, with whom he was discussing sales possibilities, stated, " * * * a close relationship with General Dynamics certainly couldn't harm * * * [our] situation at Convair." Jung concludes, "We feel that Straza will definitely come around." [42] Additional references are contained in the record. The documents in evidence lead to the altogether reasonable conclusion that reciprocity considerations were injected into sales discussions and that the intent was to rise above the normal considerations of competition by exercising the leverage which existed.[43] The clear inference to be drawn is that the sales agreements resulting from these discussions contained implied reciprocity considerations. These agreements which emerged from a course of conduct clearly declared anticompetitive are suspect themselves because of the circumstances which surround them, though no express condition is evident on the face of the agreements. See United States v. Paramount Pictures, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948); United States v. Griffith, 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236 (1948); American Tobacco Co. v. United States, 147 F.2d 93 (6th Cir. 1944), aff'd 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946). The defendant has systematically injected reciprocal dealing into its sales negotiations. Thus the agreements which are the product of this anticompetitive practice, with the effect of barring competitors from the market, are in restraint of trade, their purpose being to hamper free competition in the market. See White Motor Co. v. United States, 372 U.S. 253, 261–262, 83 S.Ct. 696, 9 L.Ed. 2d 738 (1963).

In light of the § 7 discussion of the probable substantial lessening of competition which would and has in part, resulted from the merger, little need be added here on the question of the amount of commerce restrained, insofar as § 1 is concerned. The record contains the relevant statistical information.[44] It is clear, however, that the agreements in question involved a not insubstantial amount of commerce. See generally, International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947). The reports and surveys of the defendant itself show the amount of business it ascribed to the Special Sales Program.[45]

In conclusion, although the charge presented is a novel one, the court, on the evidence presented, again cannot say that the government has failed in its burden insofar as § 1 is concerned. On the rec-

---

40. See e. g. GXs 91 and 123.

41. GX 91 (under dated entry of May 17).

42. GX 91. See also GX 170 (at pages 2–3)—description of meeting with Shell Oil Company.

43. See GX 167—"To the best of my knowledge, we have no SSP here so we will just have to fight it out on the basis of product and service."

44. See e.g. GXs 162 and 177.

45. See GXs 125, 141 and 144–155.

ord as it now stands, the plaintiff is entitled to relief.

## CONCLUSION

At this time, the court awaits the presentation of the defense. Nothing contained in this memorandum is intended to foreclose the defendant of its opportunity to be heard. What may now be reasonable and logical inferences from the evidence may be shown to be something entirely different. At this point in the litigation however, the plaintiff-government has effectively met its burdens.