**UNITED STATES of America,**
**Plaintiff,**

v.

**GENERAL DYNAMICS CORPORATION,**
**Defendant.**

**No. 62 Civ. 3686.**

United States District Court
S. D. New York.

Aug. 26, 1966.

See also D.C., 246 F.Supp. 156.

Bernard M. Hollander, Robert W. Tobin, Allen E. McAllester, Washington, D. C., for the United States.

Cravath, Swaine & Moore, by Bruce Bromley and Denison Ray, New York City, for defendant.

CANNELLA, District Judge.

The court finds that the plaintiff, United States of America, has proven by the fair preponderance of the credible evidence, that the defendant, General Dynamics Corporation, has violated the provisions of Section 7 of the Clayton Act, 38 Stat. 731 (1914), as amended, 15 U.S.C. § 18 (1958).[1] Moreover, the government has proven that the merger agreement is violative of Section 1 of

1. Section 7 provides, insofar as it is pertinent: "No corporation engaged in commerce shall acquire * * * the stock * * * of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."

the Sherman Act, 26 Stat. 209 (1890), as amended, 15 U.S.C. § 1 (1958).[2] It has failed to prove the Section 1 charge with reference to alleged contracts on condition made with certain of the defendant's vendors. General Dynamics is ordered, as indicated infra, to divest itself of its Liquid Carbonic Division, thereby restoring that enterprise to its previous independent corporate status.

By complaint filed on November 8, 1962, the government commenced a civil anti-trust action against the defendant charging that the merger of the defendant with Liquid Carbonic Corporation on September 30, 1957 may have the effect of substantially lessening competition or tending to create a monopoly in the manufacture, distribution and sale of carbon dioxide, in violation of Section 7 of the Clayton Act. In addition, the government asserts that the effect of a special sales program, established and implemented by the defendant, was to produce certain contracts on condition in violation of Section 1 of the Sherman Act. To this latter charge was added, by way of the government's granted motion to conform the pleadings to the proof, the allegation that the merger itself violated Section 1. See memorandum of this court, August 4, 1965.

To establish a violation of Section 7 of the Clayton Act, the government must prove the three elements delineated in the Section, viz., a "line of commerce" in a given "section of the country" which may be adversely effected by the merger. The parties have stipulated that "the manufacture, distribution and sale of carbon dioxide in the United States (excluding Alaska and Hawaii) is a 'line of commerce' in a 'section of the country', as those terms are used in Section 7 of the Clayton Act." [3] Thus the function of the court as to this charge is narrowed to a determination of whether or not the acquisition in question "may * * * substantially * * * lessen competition, or tend to create a monopoly."

Similarly with reference to the charged violations of Section 1 of the Sherman Act, the parties, via stipulation, have reduced the area of the court's inquiry. The statute's requirement that an alleged restraint effect "commerce or trade among the several states" is satisfied by the stipulation that: "General Dynamics, through its Liquid Carbonic Division * * * has shipped carbon dioxide and other industrial gases in interstate commerce from some of its plants or warehouse locations to various other States of the United States, including the Southern District of New York." [4] There remains the question of whether the defendant has made contracts in restraint of trade involving a not insubstantial amount of commerce.

General Dynamics, at the conclusion of the government's case, moved pursuant to Rule 41(b) of the Federal Rules of Civil Procedure, to dismiss the complaint. Since the action was tried without a jury, the evidence was viewed by the court at that time, not with the favorable inferences which necessarily must be afforded to the plaintiff's proof in a jury case (see O'Brien v. Westinghouse Electric Corp., 293 F.2d 1 [3rd Cir. 1961]), but rather as an unbiased trier of fact. Huber v. American President Lines, 240 F.2d 778 (2d Cir. 1957). The court, in denying the defendant's motion, concluded that the government, on the record as it then stood, was entitled to the requested relief.[5]

Parenthetically, it should be noted that the function of that earlier opinion was confined to indicating the legal reasoning and evidence upon which the court's

---

2. Section 1 provides, insofar as it is pertinent: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce, among several States * * * is [hereby] declared to be illegal * * *."

3. Government's Exhibit (hereinafter GX) 176.

4. GX 177, ¶9.

5. See opinion of this court dated July 26, 1965, 246 F.Supp. 156.

denial of the motion to dismiss was predicated. No attempt was made to detail the elements of the government's case, with the exception of the most pregnant items of proof. The present opinion sets forth the findings of fact *in toto*, insofar as they have influenced the court's decision, singularly or cumulatively.

### FINDINGS OF FACT
### BACKGROUND

General Dynamics Corporation is a corporation organized and existing under the laws of the State of Delaware, with its principal executive offices in New York, New York.[6] It was incorporated on February 21, 1952 for the purpose of acquiring Electric Boat Company, a private producer of submarines, and its subsidiary, Canadair, Limited, a leading Canadian aircraft manufacturer. This merger was accomplished on April 25, 1952.[7] Thereafter followed a chain of acquisitions by the defendant bringing within their corporate entity such companies as Consolidated Vultee Aircraft Corporation (Convair) (1954), Stromberg-Carlson Company (1955), Liquid Carbonic Corporation (1957) and Material Service Corporation (1959).[8]

At the time of the merger with Liquid Carbonic in 1957, General Dynamics had developed into one of the nation's twenty largest industrial enterprises, with net sales exceeding 1.5 billion dollars.[9] Its asset value as of that date was $480,000,000.[10] By 1961 the net sales figure had risen to over 2 billion dollars.[11] Approximately between 75% and 85% of General Dynamics' sales are to agencies of the United States Government, principally the armed services, AEC and NASA.[12]

In 1957, General Dynamics' purchases from its 80,000 suppliers[13] totalled approximately $500,000,000.[14] While no precise figure is to be found in the record, an officer of the defendant stated in an intra-corporate memorandum, dated May 27, 1958, that: "It is estimated that at least 75% of our suppliers purchase, to some extent, the types of products or equipment offered for sale by the Liquid Carbonic Division."[15] This estimate is of minimum evidentiary value since, *inter alia*, the 75% figure is not confined to the lines of commerce in issue. Nonetheless it does suggest the potential for reciprocity which resulted in the defendant's establishment of the Special Sales Program, the details of which will be discussed subsequently.

The other party to the merger, Liquid Carbonic Corporation, had assets valued at $59,000,000 in 1957.[16] While this figure is small compared to the asset valuation for General Dynamics, Liquid Carbonic is a substantial enterprise in its particular industry. The evidence indicates that it enjoyed somewhere between 35% and 40% of the carbon dioxide market at the time it was acquired, and as such constituted the largest domestic producer and distributor of gaseous, liquid and solid carbon dioxide.[17] Its total net sales for the year 1956 exceeded $35,000,000,[18] more than $18,000,000 of which was attributable to the sale of carbon dioxide.[19]

As of course would be expected, the Liquid Carbonic Division supplies all but a negligible amount of the carbon

---

6. GX 177, ¶2.

7. Ibid.

8. Ibid.

9. GX 177, ¶4.

10. GX 13, Doc. No. 3989.

11. GX 177, ¶4.

12. See GX 177, pp. 6–7. See also government's trial memorandum, p. 11, and defendant's memorandum in support of motion to dismiss, N. at p. 48.

13. GX 70, p. 1, ¶3.

14. GX 42, p. 1, ¶2.

15. Ibid.

16. GX 13, Doc. No. 3989.

17. GX 15B, Doc. No. 4191.

18. GX 13, Doc. No. 4004.

19. GX 177, ¶10(a).

dioxide needs of General Dynamics. Thus in 1959, the Liquid Division supplied 96.5% of the defendant's requirements, which amounted to over $200,000 in that year, as compared to a 12.4% share of the business immediately prior to the merger.[20]

It is important to note, for reasons that will be developed in the subsequent discussion of the charged violation of Section 7 of the Clayton Act, that the manufacture and distribution of carbon dioxide occurs in an oligopolistic setting. The four principal firms at the time of the merger controlled approximately 75% of the market, with Liquid Carbonic and Air Reduction Company accounting for an estimated 60% of the total.[21]

The merger accomplished the amalgamation of General Dynamics, a corporation of mammoth proportions, with Liquid Carbonic, an entity, which although smaller in absolute terms, was the leader in the carbon dioxide industry.

## PRE-MERGER INTENT OF GENERAL DYNAMICS CORPORATION

General Dynamics' primary purpose in effectuating the merger in question was to diversify its activities, thereby partially protecting itself from the cyclical sales picture which typically confronts defense-oriented companies. Immediately prior to the merger, General Dynamics sold approximately 75% of its products to the government; the then president of General Dynamics, Frank Pace, testified that the corporation sought, as a long run objective, to reduce this figure to 50%.[22] Internal expansion of present facilities to develop commercial lines had proven unprofitable.[23] Therefore the most appropriate avenue for diversifica-

tion appeared to be via the acquisition of existing commercial enterprises.

The management of General Dynamics decided that expansion into the chemical field would permit the corporation to capitalize on its specialized knowledge in the fields of solid-state physics, metallurgy, nuclear development and thermodynamics.[24]

The possibility of acquiring the Liquid Carbonic Corporation came to the attention of a senior vice-president of General Dynamics in 1956. After an extensive investigation of the various aspects of Liquid Carbonic's operations and financial condition, a special committee of the Board of Directors recommended the merger.[25] The Board adopted the recommendation and the merger was consummated.[26]

While the primary purpose of General Dynamics was to diversify, the evidence indicates that the defendant was aware of, and in at least passive agreement with Liquid Carbonic's intent of merging for reciprocity purposes.[27]

While the defendant's 1957 purchases from its vendors totalled approximately one-half billion dollars,[28] it was not in a position to convert this huge purchasing power into market power, for the bulk of the corporation's products were sold to the government.[29] In making Liquid Carbonic a division, this situation was altered in that General Dynamics then marketed a product which many of its suppliers used.

The defendant maintains that the record is devoid of any evidence which even suggests that the management of General Dynamics considered the question of reciprocity prior to merger. It is clear, as will be discussed subsequently,

20. GX 177, ¶19.

21. GX 15A, Doc. No. 4032.

22. Trial record (hereinafter TR.), pp. 571–73 (Pace). See also TR. pp. 605–06 (Finucane). See generally TR. pp. 665–95 (White).

23. TR. p. 575 (Pace) ; TR. p. 632 (Johnson).

24. TR. pp. 635–40 (Johnson).

25. TR. p. 610–12 (Finucane) ; Defendant's Exhibit (hereinafter DX) B, Doc. No. 04323.

26. GX 14, Doc. No. 04006; DX B, 04323.

27. For the definition of "reciprocity" see text infra at pp. 64–72.

28. See note 14 supra.

29. See note 12 supra.

that Liquid Carbonic considered the opportunity for increasing its sales by the use of reciprocity as the most attractive feature of becoming a division of General Dynamics. Moreover, the defendant admits that in May, 1958, eight months after the date of merger, the Board formally adopted the Special Sales Program, a vehicle which the court finds was intended to effectuate the pre-merger reciprocity objectives of the Liquid Carbonic management. From these facts alone, viewed in conjunction with the thorough pre-merger investigation conducted by General Dynamics, it is highly improbable that the defendant was wholly without knowledge of the objectives harbored by Liquid Carbonic. This improbability is reinforced by other evidence in the record.

A letter dated August 14, 1957, signed by a vice-president of Liquid Carbonic, J. A. Edwards, was included in the final report submitted to the Board of General Dynamics, in which Edwards states that the plants of Liquid Carbonic were operating at 65% of capacity and production thus could be readily increased for the "additional sales that will be generated with the assistance of General Dynamics". Similarly, the submitted income forecast covering the five fiscal years ending March 31, 1962 was compiled "particularly taking into consideration anticipated results from the assistance we expect to receive from General Dynamics." [30]

Any claim that this anticipated increase in sales and profits was expected solely as a result of an upgraded research and development program and improvements in the sales force runs into difficulty with the phraseology employed by Edwards. While an increase in sales from the foregoing factors generally takes time to materialize, Edwards

speaks of production facilities capable of accommodating an "immediate" increase in production, a result which reasonably could be expected from the use of reciprocity.

The court also considers a letter dated March 6, 1958, from Kenneth Stiles, General Dynamics' Vice-President for Plans and Programs, to C. R. MacBride, a corporate Vice-President, as significant.[31] In March 1958, Pace appointed C. R. MacBride to assist the Liquid Division in matters pertaining to reciprocity.[32] The letter from Stiles, noting that reciprocity was now MacBride's department, reported that "up until the present time", his office had endeavored to take the first steps in instituting a program of sales reciprocity. Since no particular date was indicated for the commencement of Stiles' efforts, the most reasonable conclusion, and the one drawn by the court, is that starting date was the time of the merger.

It should be further noted that almost immediately after the merger, Nicholson, then a Senior Vice-President of General Dynamics, addressed a meeting of the Regional General Managers of the Liquid Carbonic Division and discussed reciprocity procedures.[33]

This immediate post acquisition activity in laying the ground work for the establishment of the Special Sales Program, when considered with the other evidence in the case, indicates that as of the date of merger, General Dynamics was not ignorant of the reciprocity considerations entertained by Liquid Carbonic.

 The court finds that when Johnson, a Vice-President of General Dynamics, who was a chief intermediary between the two corporations prior to merger, assured Nicholson that he would remain the chief executive officer of the

---

30. GX 15A, Doc. No. 4130.

31. GX 29.

32. GX 28, p. 3, lines 12–13.

33. The details of that address are unknown. The awareness of the topic is derived from the agenda of the October 7–8, 1957, "Regional General Managers' Meeting", which lists the October 7th, 11:30 A.M. topic as "Reciprocity Procedures (General Dynamics) R.L.N." R.L.N. refers to Nicholson, GX 25, Doc. No. 23918.

Liquid Carbonic Division, presumably with power to implement his policies,[34] there was a meeting of the minds as to the use of reciprocity.[35]

## PRE-MERGER INTENT OF LIQUID CARBONIC CORPORATION

Unlike the determination of General Dynamics' pre-merger intent, which is predicated on circumstantial evidence, thus requiring the designation of the important facts from which the inference of knowledge was drawn, the question of Liquid Carbonic's intent lends itself to a simpler resolution.

Liquid Carbonic, through its then President, Nicholson, stated that via the merger the unexploited purchasing power of General Dynamics would be made available for reciprocity purchases.[36] Nicholson further explained that "the advantage of this reciprocity would be of unlimited value in getting a load on our plants both old and new—If, through reciprocity, we could put a load on all our plants on a year-round basis, our earnings could rise very rapidly." [37] "This opportunity is available to us now. If we reject it, General Dynamics will deal with one of our competitors * * *. Based on the experience I have had * * * I would hate to face one of our major competitors if he were to have at his disposal the tremendous purchasing power of General Dynamics to be used as a reciprocal instrument of sales".[38]

To reiterate, Liquid Carbonic considered the opportunities for reciprocity as its most significant advantage to be derived from the merger. General Dynamics, on the other hand, although aware of the market power created by the merger and at least passively assenting to aid the implementation of Nicholson's scheme, was primarily motivated to merge by a desire for diversification.[39]

## SPECIAL SALES PROGRAM CREATION

As previously noted, following the preliminary efforts of Stiles, C. R. MacBride was appointed by Pace to assist the Liquid Carbonic Division in reciprocity matters. This appointment of MacBride marked the beginning, at least insofar as is apparent from the record, of the systematic development of the Special Sales Program.

Following a meeting of the senior operating executives in Chicago, C. R. MacBride sent a memorandum, dated April 8, 1958, to all division managers asking them to prepare a list, to be furnished to Morgan MacBride of Liquid Carbonic, of each division's use of Coca Cola, Seven-Up and Pepsi Cola.[40]

On May 14, 1958, C. R. MacBride presented a document entitled "Trade Re-

34. GX 13, p. 14, and Exhibit C attached.

35. Parenthetically then, when Nicholson used the less than categorical phrase "if my information is correct" in introducing his statement to the Liquid Carbonic Board that as a result of the merger "Liquid's management would have at its disposal the entire purchasing power of General Dynamics' other Divisions for reciprocal buying purposes", he was in fact accurately relating the pre-merger agreement. GX 16, Doc. No. 28342. However, while Nicholson's statement is in accord with the court's conclusion on this point, the statement was received in evidence only as probative of Nicholson's state of mind. It was not considered, directly or otherwise, in the court's determination as to General Dynamics' pre-merger intent.

36. EX 16, Doc. No. 28341.

37. Id. at 28342.

38. Id. at 28347.

39. While this difference in the importance attached to reciprocity by the respective parties is suggested by the pre-merger evidence, it is clear that the Special Sales Program, as it in fact developed, was the product of the more or less equal joint efforts expended by the defendant's senior management and Nicholson of its Liquid Carbonic Division. See discussion infra.

40. GX 32. The resulting responses apparently served as the information from which the document "Soft Drink Consumption 1957—General Dynamics Divisions" was compiled. See GX 35, 6th page (pages unnumbered).

lations Policy and Procedure" [41] for the consideration of Pace, Johnson, Nicholson and Morgan MacBride.[42] Incorporated therein are the suggestions of C. R. MacBride concerning the prerequisites to the effective implementation of the reciprocity program. Among the more significant suggestions are points 1, 9, and 13. Point 1 is: "Each President or General Manager of a Division should understand the value of the reciprocity program and how it can be used to load Liquid Carbonic Division plants to materially increase profits in the Liquid Carbonic Division." [43] Point 9 explains: "The development of advantageous trade relations with outside suppliers who enjoy substantial amounts of General Dynamics business will be conducted by Liquid Carbonic headquarters in collaboration with General Dynamics headquarters." [44] Point 13 provides that the "Liquid Carbonic Division will be responsible for developing adequate procedures for the compilation of significant data, the preparation of reports and the designing of a follow-up system to assure continued effort." [45]

No evidence was introduced into the record which indicates precisely how and when the senior management of General Dynamics formally adopted the contents of the C. R. MacBride report. Nonetheless it is obvious to the court that such adoption occurred. Indeed the Special Sales Program, as it in fact operated, in all essential respects exactly parallels the MacBride format.

### PURPOSE

The purpose of the program was succinctly stated by Senior Vice-President C. R. MacBride to be "to aid the Liquid Carbonic sales picture via General Dynamics' reciprocity leverage."[46] It was felt that profits could be "greatly increase[d]" by "capitalizing on the tremendous value of our purchasing power —by soliciting reciprocal trade." [47]

Along the same lines is the following statement in a speech given by Jung, Presidential assistant in charge of reciprocity: "Let's not kid ourselves, the ultimate reason for establishing a trade relations department is to increase sales through the proper application of your purchasing power." [48]

### STRUCTURE AND PROCEDURES

At the time of the merger, few legal guidelines existed concerning the legality of reciprocity practices. Programs such as the Special Sales Program were by no means unusual in the business community.[49] Nonetheless, although the commonness of the practice and its then arguable legality might suggest a different result, General Dynamics attempted to keep tangible evidence of their reciprocity procedures to a minimum.[50] Thus it is not surprising that no document in evidence presents the precise details of the program. However, documentary proof, consisting primarily of intra-corporate memoranda, indicates the essential procedures involved.

Reduced to its two essential features, the operation of the program was predicated upon the preparation of information indicating which major vendors of General Dynamics were also purchasers of the products manufactured and sold by Liquid Carbonic. The companies listed, represented the targets for the Spe-

41. GX 35.

42. GX 36, p. 1, ¶2.

43. GX 35, p. 1.

44. Id. at 2.

45. Ibid. While the latter two points are essentially self-explanatory, it is interesting to note that the purpose, i. e. "load * * * [the] plants", delineated in point 1, is in accord with the advantage of the merger cited by Nicholson and is consistent with the tenor of the Edwards' letter.

46. GX 41.

47. GX 42, p. 1, ¶2.

48. GX 93, p. 2.

49. See discussion in Hausman "Reciprocal Dealings and The Antitrust Laws", 77 Harv.L.Rev. 873, 874–79 (1964).

50. See, e. g., GXs 41 ("It is not our intention to broadcast such data [certain vendor information], for obvious reasons.") ; 96B ; 170, Doc. No. 23110, ¶4. See also N. 77 infra.

cial Sales Program approach. The second aspect of the program called for contacts between General Dynamics and these "targets" to occur only at the higher levels of management.

Considering first the compilation of vendor information, the first instance of this is found in the previously mentioned chart, dated May 12, 1958, listing the divisional consumptions of various soft drinks.

Two memoranda dated in July of 1958, indicate that Liquid Carbonic was receiving information from its sister divisions reflecting the volume of their purchases from principal vendors. In the case of the Electric Boat Division, separate statements on payments made to airlines, trucking companies, railroad and insurance companies, were included.[51]

By the late summer of 1958, a concerted effort was made to systematize the operation and to begin in earnest, making the necessary contacts.[52] The vendor information from the divisions had been obtained and "prospect cards" and "sales report" forms were prepared. The "prospect cards" contained the names and addresses of potential reciprocity accounts, and other relevant information. The "sales report" forms were for reporting the results of the contacts with prospects. Both the "prospect card" and "sales report" forms were to be executed in triplicate, with a blue copy for a central file in Chicago, a yellow copy for the person to whom the particular prospect had been assigned, and a pink copy for Regional files.[53]

Apparently to supplement or cross-check the information regarding results furnished by the "sales reports", Liquid Carbonic sent the following telegram to its regional managers on April 7, 1959:

"Please submit by April 15th amount of business secured by Special Sales Program segregating industrial-medical and $CO_2$ and listing the names of the accounts and total dollar volume. These figures needed for General Dynamics main office. Please be accurate and on time." [54]

The figures contained in the responses to the telegrams were compiled in a chart which indicates a combined total of business secured by the Special Sales Program, as of April 1959 as $1,085,066.[55]

In May 1959, the reciprocity program was further systematized by the introduction of a regional card index system to record all relevant information about each Special Sales Program account on individual cards. Each of these cards indicated, among other things, the purchases by each General Dynamics' division from the particular regional account. The information from the cards was further condensed into the form of "vendor books", which listed 4,000 suppliers and subcontractors whose 1958 sales to General Dynamics exceeded $10,000. It was felt that only those companies whose sales were in excess of that amount would realistically "qualify for S.S.P. treatment". Each regional sales manager was provided with a vendor book.[56]

The final major refinement in the program was made in the Spring of 1961. The vendor information as it then existed was limited to regional reports. This fragmentation of information created problems. As noted by Jung, an assistant to the President of Liquid Carbonic in charge of reciprocity, "one obvious weakness in this program to date has been our lack of complete information on a given company.

---

51. GXs 44, 45.

52. GXs 47, 48.

53. GXs 51, 54.

54. GX 124. As will be seen subsequently, the defendant contends that the resulting responses were grossly inaccurate.

55. GX 125. This figure is mentioned at this time merely to indicate the manner in which information was compiled by the defendant for purposes of reciprocity. For similar subsequent compilations see GX 142, GXs 144–50, TR. pp. 266–67 and GX 143, GXs 151–55, TR. pp. 274–77.

56. GX 70. See also GXs 7, 71A, 71B, 71E.

For example, I made a call on Food Machinery & Chemical Company in New York City on behalf of Tom Isaacson's ice interests at their plant in Modesto, California. Beyond this Pacific Region ice interest, there was no information in Chicago to reveal their requirements for our products at their many plants around the United States".[57] This deficiency precluded the General Dynamics' representative from fully appreciating the extent of reciprocity power involved, thereby weakening his bargaining position. To provide what Jung calls the "full picture" on important accounts, the National Account System was established. This group of accounts consisted of approximately 350 companies each of which sold a minimum of $250,000.00 of goods in 1960 to General Dynamics. Each of these companies had multi-plant locations which transcended the boundaries of the Liquid Carbonic sales regions.[58] Consistent with the requirement that all inter-corporate reciprocity conferences occur at high levels, the group was "further limited to those accounts operating under a headquarters-controlled purchasing mandate, not those whose final purchasing authority for our products rests at the individual locations." [59]

Considering now the second aspect of the program, i. e., that reciprocity contacts must occur at high levels of management,[60] the reasons for this mandate is clearly indicated in the record. Purchasing agents who are charged with purchasing materials on the basis of price, quality and service, respond poorly to the interjection of reciprocity considerations into sales negotiations.[61] As explained by one officer of General Dynamics, a diplomatic approach is required in contacting prospective customers since "we are, in effect, coming into conflict with a basic urge possessed by all people—namely, their right to exercise Freedom of Choice." [62] It was feared that pressure applied directly to purchasing agents, whose jobs are too limited to appreciate the "mutual benefits" of reciprocity, could lead to complaints to the Anti-trust Division of the Justice Department. Jung, in addressing himself to this problem, said: "All that is needed to place this program in dire jeopardy and bring strong corporate pressure for its demise is to have one irate letter written to federal authorities by a company resenting what was felt to be undue pressure." [63]

Even prescinding from considerations of a purchasing agent's probable resistance to, and possible complaints of, reciprocity suggestions, rudimentary logic suggests that he would be an inappropriate person to contact. In essence, reciprocity is a sales generating device which, when viewed broadly, will benefit both participants. The harm produced by the practice accrues to the competitors of the participants and ultimately to the public. Considerations of "mutual benefit" being foreign to a purchasing agent's job, higher management must be contacted. The insertion of this alien factor into purchasing pro

57. GX 97, p. 2.

58. Ibid.

59. GX 95, p. 1, ¶2.

60. See, e. g. GXs 27, 40, 59, Doc.No. 23531, 95, p. 1, ¶2.

61. See GX 67, p. 3, which includes a report of a purchasing agent's response, addressed to a Liquid Carbonic representative in a public waiting room, to reciprocity overtures. The document indicates that the purchasing agent stated that "our action was viewed by their Management as pure intimidation and degrading coercion on the part of General Dynamics. Although they enjoy Convair's business, they consider themselves equally as large as General Dynamics, they practice more dignified management, and no one is going to tell them what to do." See also GX 91, visit of October 11, 1960 to United Aircraft Corp.: "Champion is a real fish * * *. He's a straight price buyer and staunchly defended his unwillingness to negotiate. He said our bid had been substantially high—if we're low next bidding season we'll get it."

62. GX 50, p. 1.

63. GX 95, p. 2, ¶1. See also GXs 97, p. 5, last ¶; 94, p. 2 ("Big Boys Sophisticated—little guys holler loud.")

cedures must be mandated by upper management.[64]

Not surprisingly in view of this policy, the numerous exhibits in evidence concerning reciprocity contacts, all identify higher management on both sides of the bargaining table.[65] The defendant's representatives invariably mentioned the amount of business the prospective customer was deriving from its sales to General Dynamics.[66] This of course, was the reason for the elaborate compilation of vendor data. The reception to the "sales pitch" was generally favorable. Not atypical is the reaction of the Straza Corporation when contacted by the defendant: "When given the community of interest pitch, Russell became very receptive and said he certainly saw the importance of doing business with friends, though he was not inclined to break his contract with Victor since they had treated him so well. He stated that a closer relationship with General Dynamics certainly couldn't harm his situation at Convair. We feel Straza will definitely come around." [67] Along the same lines, the response of Mr. Haney, President of Kirkhill Rubber Company, was described as follows: "Han-

ey saw the picture immediately, called in the P.A., Mr. Atkinson and instructed him that if Liquid Carbonic could provide them with prices equal to those they are presently paying, future business should be given to Liquid." [68]

The usual arrangement was that if Liquid Carbonic could match the terms of its competitors, Liquid would automatically obtain the business.[69] Sometimes such equality apparently was not even required. A case in point is the contact made with M. W. Kellogg. That company's representative "admitted" that reciprocity had not been considered in the placement of its purchase orders, and that the firm had given its business to a competitor of Liquid Carbonic's on a "price only basis". Assurances were thereupon received that the matter would be reconsidered in the light of the defendant's Special Sales Program.[70] Similarly when contact was made with Purolator Products, Inc., the defendant was promised that future purchases by Purolator would not be based on price and quality alone, thereby causing Jung to conclude that Liquid Carbonic could secure a share of the business.[71] After the details were worked out, the purchasing

**64.** GX 93, p. 4. As Jung explains: "My main efforts are directed to bringing top management to the point where I meet the purchasing agent and he is told in my presence, by the president or vice-president, that their company wants to do business with ours." See also GX 170, Doc. No. 23112, ¶3.

**65.** See, e. g., GXs 63 (Nicholson and President de Young of Goodyear Tire and Rubber Company); 64 (Nicholson and Chairman of the Board Wright of Thompson, Ramo & Wooldridge); 66 (Nicholson and President Weatherhead of Weatherhead Company). See also GX 60 (Pace and Adams of Raytheon-Adams' corporate capacity not indicated).

**66.** See, e. g., GX 91, May 17, 1960 visit to Kirkhill Rubber; May 18, 1960 visit to South Bay Mfg. Co.; May 19, 1960 visit to Straza Corp.; May 23, 1960 visit to Marquardt Aircraft; May 26, 1960 visit to Crane Co.; June 10, 1960 visit to General Metals; July 20, 1960 visits to M. W. Kellogg, Sylvania Electric and Kollsman Instrument; October 18, 1960

visit to Purolator Products, Inc. See also GXs 215–17; 223–24; 231.

**67.** GX 91, May 19, 1960 visit to Straza Corp.

**68.** GX 91, May 17, 1960 visit to Kirkhill Rubber.

**69.** See, e. g., GXs 91, May 17, 1960 visit to Kirkhill Rubber and July 13, 1960 visit to Bendix Aviation; 217, Doc. No. 23970, ¶3; 232; 77, p. 1, ¶4.

**70.** GX 91, July 20, 1960 visit to M. W. Kellogg.

**71.** GX 91, October 18, 1960 visit to Purolator Products, Inc. See generally the interesting report from the Pacific Region in which the comment is made, with reference to a reciprocity account's intention to solicit bids from all suppliers that, "this business of going out for bids puts the thing on a strictly price basis, which we should strive to avoid." GX 169. See also text infra at pp. 52–3 where the defendant gained an account at Raytheon, although its price per ton was five dollars higher than that of a competitor.

agents were told of the arrangements by their corporate superiors.[72]

While the contacts usually progressed as indicated above, on some occasions resistance was encountered. Illustrative of this is the cool reception received at the Bendix Aviation Company. In commenting on what is termed a "polite brush off",[73] the defendant's representative says: "It became quite obvious that the forewarning that Morgan MacBride gave me was coming to pass in the sense that they do not like the idea of being pushed into a change because of reciprocity." [74]

In at least one recorded incident the program, while initially well received, encountered later difficulties as the defendant continued to apply pressure. That incident occurred with Raytheon and is described by Jung as follows: "I brought up [the] subject [of] * * * the dry ice requirements at Lowell, Bedford and Waltham. They are presently supplied at these points by Cardox and we wish to take over all three at a price advantageous to Raytheon. When I suggested this to Wilson, he said, 'What do you want, blood? You already have 95% of our $CO_2$ business.' I suggested that blood would be fine and he promised to check into the matter." [75]

In regard to the approach employed in contacting reciprocity accounts, the ideal was one of "soft sell".[76] It was felt that a hard line was unnecessary since higher level management could be expected to see the obvious advantages in doing business with Liquid Carbonic. In those few instances where the implied threat of a curtailment in the account's sales to General Dynamics was apparently not grasped, or where it was understood but rejected, this information was forwarded to headquarters in Chicago so that appropriate action could be taken.[77] The prospective account would be told of this so that he could appreciate the cost of his reluctance.[78]

While reluctant accounts could expect possible adverse treatment at the hands of Liquid Carbonic's sister divisions,[79] the converse was generally not true for cooperating customers. In the normal course of events an account which cooperated merely continued to receive its share of sales to General Dynamics, i. e., the status quo was maintained. No affirmative promises of favorable treatment were made. However, contrary to what might be expected, there is some evidence in the record of affirmative action taken by the defendant to aid particular accounts. Thus Jung wrote to Convair asking that Churchill Chemical Corporation, a Special Sales Program account, be permitted to make their sales presentation to someone other than Mr. Miller, who apparently had turned a deaf ear to Churchill's approach.[80] Jung also wrote to a vice-president of Great

---

72. See note 64 supra.

73. GX 55, p. 1, ¶3.

74. Id. at ¶2.

75. GX 230, p. 2, ¶1. The phrase "at a price advantageous to Raytheon" probably means to match the lowest offer of a competitor. Otherwise the negative response of Wilson is difficult to understand. However, even if the defendant intended to squeeze out Cardox by the strange combination of reciprocity and a lower price, it is obvious that Wilson felt that his freedom of choice was being violated. Conceivably for instance, under this second interpretation, Wilson had hoped to be served by multiple suppliers to avoid the difficulties which can result from dependency on one source of supply.

76. GXs 50; 92, p. 2, next to last par.

77. See, e. g., GXs 67; 77, p. 1, ¶s4–6. Evidence of this system of reporting the names of reluctant accounts is scarce. The source of the scarcity is suggested by the postscriptum of GX 67 which states: "I would recommend that this correspondence be destroyed. We are taking all copies of this letter as well as the copies of the attached reports out of our files."

78. GXs 170, p. 3, ¶4; 229.

79. See GX 91, May 18, 1960 visit to South Bay Mfg. Co. ("Safady's attitude has changed considerably for the better since Murray's last visit. He has lost several more bids to Convair and he is hurting.")

80. GX 100. See GX 101 (arrangement made to by-pass Miller).

American Industries, Inc., saying that he was "sorry to hear about [his] disappointment at Electric Boat" and indicating that the "only way [he] might be of any help to [him is] to have knowledge of [his] sales activities prior to the order being let." [81] Another case in point is the additional purchases by Convair of Transitron products, totalling at least $150,000 to $200,000 per year, "as a result of Liquid Carbonic's interest in this particular subject." [82] These three instances of affirmative aid are atypical since such gestures by the defendant are not part of the usual bargain.[83]

## RESULTS OF THE PROGRAM

Thus far the creation, purpose and procedures of the Special Sales Program have been considered. Attention is now directed to the results realized via the program.

Preliminarily, mention should be made of the defendant's contention that governmental regulations over its purchasing procedures, as embodied in ASPERS, necessarily precludes an effective reciprocity program. For purposes of this argument, the defendant initially points out the difficulty of pinpointing particular causes for given results in the anti-trust area. Specifically, while the downward slide of Liquid Carbonic's share of the market ended with the merger, and its sales to reciprocity accounts fared better than its sales to non-reciprocity accounts,[84] the defendant maintains that these results are unrelated to the Special Sales Program.

For a reciprocity approach to sales to have any meaning, the threat of curtailing purchases from noncooperating prospective customers must be capable of realization. Between 75% and 85% of General Dynamics' sales are to agencies of the United States government.[85] If the vendors of General Dynamics knew that all of the defendant's purchases were made on the basis of an open bid system, with the award invariably going to the lowest bidder pursuant to government contract requirements, there would be no basis for reciprocity. Clearly, however, the vendors could not have such knowledge since this hypothetical is contrary to fact.

The threshold question which suggests this conclusion is why would the defendant, who presumably is most aware of the effect of ASPERS on its business, establish the Special Sales Program if it is incapable of generating sales? The evidence in the case demonstrates that the defendant's management, without a recorded dissenting "vote", considered the program as the most promising tool for increasing sales.[86] One officer of the defendant labels it as the "dynamite"

81. GX 174, ¶1.

82. GX 102.

83. See DX K. See also GX 173 in which Mathey, a vice-president of the Liquid Carbonic Division, states that: "Standard Oil wouldn't award the business until they found out about Convair, where they were bidding on a large gasoline and oil contract. Clark arranged for Standard Oil to meet the competitive bid. We then came up with the CO2 award." During the trial Bishop, a senior buyer at Convair, discussed the award to Standard Oil. Bishop explained that Standard Oil and Shell Oil submitted the outstanding low bids among the seven bids solicited. Both companies were told that their bids were in the same neighborhood, and were asked to submit one further bid, the lowest of the two to receive the contract.

Standard Oil's bid at this time was the lowest. Bishop testified that this was not an unusual procedure and is sanctioned by ASPERS. He indicated that the final selection was made purely on a price basis, divorced from any considerations of reciprocity. The court finds that Bishop's testimony was credible and that this instance was not one in which reciprocity played a dominant part, at least insofar as the defendant was concerned. See TR. pp. 825–45. However, as a result of obtaining this award Standard Oil of California did increase its purchases from Liquid Carbonic. See N. 134 infra, 2d ¶.

84. Both of these conclusions are discussed infra.

85. See note 12 supra.

86. GXs 52, p. 1, ¶3; 160, p. 3.

that "can blow competition out of the picture * * *." [87]

The ASPERS program, as it was described during the course of the trial, provides that for the purchase of items over certain designated amounts, competitive bids must be solicited.[88] Schuler, the General Purchasing Agent for General Dynamics' Fort Worth Division, testified that they had a closed bid room to assure that the award went to the lowest bidder.[89] Moreover, before a final purchase order may be placed, government approval is required.

Ignoring the at least partial freedom of operation which existed below the "designated" monetary amount, the blatant gap in the system which destroys any claim of complete objectivity is the fact that to whom bids were sent, "was a matter of judgment by the buyers and their supervisors, and in many cases by the purchasing agents." [90] It is unlikely that bids would be solicited from uncooperative accounts. In addition, it is not inconceivable that an award could be made by requesting bids from other firms whose offers could be anticipated as being high, and including these with that of a favored account. Moreover, in the drawing of specifications, the defendant, on occasion, created a need which could be satisfied by only one supplier.[91] Quite clearly, even with bid rooms and government approval of purchase orders, the reciprocity program was not rendered impotent by ASPERS regulations.[92] Parenthetically at least some of the purchasing departments did not have bid rooms, thereby further increasing the possibilities of selective treatment.[93]

Having rejected the defendant's argument as to alleged neutralizing effect of ASPERS, short shrift can be made of their further contention that a lack of divisional cooperation prevented the Special Sales Program from realizing success. Liquid Carbonic's sister divisions were originally reluctant to cooperate for fear that the program was violative of the anti-trust laws.[94] However, the general tenor of the evidence viewed in totality, with particular reference to the compilation of vendor data, shows that cooperation was obtained. As a matter of fact, Jung had occasion to comment that: "I think we should be quite pleased with our position throughout the Corporation. I feel that we are meeting no resistance, with the possible exception of Convair, where the problem is not a lack of cooperation in their top purchasing people, but rather an internal Liquid Carbonic problem (our not having the personnel to thoroughly familiarize the vast numbers of Convair buyers with the Liquid Carbonic product line".[95]

With reference to the actual amount of business retained or secured by the Special Sales Program, as an illuminating point of departure consider the intracorporate records concerning the volume of sales generated. The previously mentioned answers of the regional managers to the telegrams from Chicago set the figure as of April, 1959, when the program was in its infancy, at $1,085,066.[96] By May of that year the total was $1,407,000.[97] Both of these figures cover the sales of carbon dioxide and industrial gases. A similar compilation prepared in the Fall of 1960 disclosed that an estimated $1,087,372 of carbon dioxide business alone had by that time been secured through the Special Sales Pro-

---

87. GX 170, p. 2, ¶3.

88. See, e. g. TR. pp. 724–32 (Schuler).

89. TR. pp. 707–08 (Schuler).

90. TR. p. 965 (Fowler). See also, TR. p. 707 (Schuler).

91. TR. p. 758–60 (Stevens).

92. See defendant's memorandum in support of its motion to dismiss, p. 70.

93. See TR. p. 757 (Stevens).

94. GX 97, p. 1, ¶3.

95. GX 95, p. 2, ¶3.

96. GXs 124, 125.

97. GX 70, p. 4; TR. p. 258.

gram.[98] At the same time, more than $1,000,000 in industrial gas business was reported as derived from the program.[99]

The inquiries, and resulting responses, upon which the above figures are predicated, were couched in the form of business secured by the program, and thus should consist entirely of newly acquired accounts. The defendant has disputed the value of the data, claiming that the reports merely reflect the exaggerations of local representatives who are assertedly eager to please the home office. The argument is without force. The reports were made as a regular accounting by the regional managers and although some slight downward modification of the figures is almost certainly in order, the reports are credible to the court as approximations of the business gained by the Special Sales Program.

The figures for the total carbon dioxide sales to "Special Sales Program" accounts for 1960, 1961 and 1962, which would include old customers as well as newly acquired accounts, were $3,189,325, $3,448,668 and $3,542,888 respectively.[100] This $3,542,888 figure for 1962 amounts to approximately 17.4% of Liquid Carbonic's total 1962 carbon dioxide sales ($20,430,000) and 6.6% of the combined 1962 sales of the six largest carbon dioxide distributors ($54,193,633).[101] While the percentage that the 1962 sales figure represents of the total industry sales is not provided, other evidence in the record indicates that figure to be about 5%.[102]

The figures for the 1960, 1961 and 1962 industrial gas sales are $2,728,816, $3,508,572 and $4,346,455.[103] Totalling the carbon dioxide and industrial gas fig-

ures for 1960 and 1962, it will be noted that the increase from $5,918,141 to $7,889,343 represents a 33% increase in sales. During the same period General Dynamics' total gas sales, including sales to reciprocity accounts, increased by only 7%.[104] Since the only difference between the two groups of accounts is the presence of reciprocity, and noting that the variation in the growth rates exceeds that which normally can be attributed to chance, the court finds that the relevant causal factor is the use of reciprocity. Of course this is not to say that all purchases from Liquid Carbonic for listed companies are attributable to this cause. The only conclusion drawn is that a sufficient number of these accounts were caused by the Special Sales Program to begin, or increase, their purchases from the defendant, thereby causing the disproportionate increase in reciprocity account sales.

The relative industry position of Liquid Carbonic before and after the merger, again demonstrates that the program, though still far from realizing its potential, helped increase sales. The 2.7% decline in Liquid Carbonic's market share in the 1954–57 period preceding the merger was effectively halted. In fact, the Liquid Carbonic Division's share of the market in each year subsequent to the acquisition is greater, although the differences are very slight, than that of the Liquid Carbonic Corporation in the year of the merger.[105]

Narrowing the scope of comparison from total industry sales to the sales made by the six largest distributors of carbon dioxide, a post merger improvement in Liquid Carbonic's position becomes apparent. Between 1957 and

**98.** GXs 142, 144–50; TR. pp. 266–67.

**99.** GXs 143, 151–55; TR. pp. 274–77.

**100.** GX 162.

**101.** GXs 162; 177 ¶10(a); 199.

**102.** It is known that the four largest companies distribute approximately 75% of the total. See N. 21 supra. From GX 199 it can be estimated that the other two of the six major distributors con-

tribute another 4% to the total, leaving 21% supplied by smaller concerns. Six-point-six (6.6) per cent of 79% would thus be equivalent to about 5% of the total carbon dioxide sales.

**103.** GX 162.

**104.** Computed from GXs 162, 177, ¶s 10–17.

**105.** GX 177, ¶s 10(a), 18.

1962, its share of the combined sales increased from 33.6% to 36.1%, as measured in tons shipped, and from 36.2% to 37.5% in dollar amounts.[106]

Now with particular reference to the Sherman § 1 charged contained in the original complaint, attention is shifted from an analysis of aggregate sales and market share figures to the consideration of specific contracts or combinations between the defendant's Liquid Carbonic Division and vendors of General Dynamics which were consummated as a result of the Special Sales Program. This line of inquiry has two facets, viz., those accounts which were retained by reciprocity and those which were acquired by that device. In either event if customers' decisions were predicated, or significantly influenced, by reciprocity—assuming the requisite amount of trade was effected—the Sherman § 1 charge has been proven.[107]

Although reciprocity has been labeled by the Supreme Court as an anti-competitive device,[108] the application of Sherman § 1 to its utilization is an area of first impression. This being the case, the court will present its findings in greater detail than would be warranted in a more developed area of the law.

The government claims that certain agreements between General Dynamics and six listed companies, viz., Transitron Electronics, Raytheon Co., Standard Oil of California, Shell Oil Co., Sylvania Electric Products and Midland-Ross Corp., were predicated on reciprocity considerations.

As regards Transitron, the argument is unpersuasive. It is true that the evidence shows the presence of reciprocity in the negotiations between the two cor-

porations. In addition, the huge increase in Transitron's purchases from Liquid Carbonic—rising from a level of $31,620 in 1960 to $444,595 in 1962[109]—generates curiosity as to its cause.

That the causal factor involved was not the application of leverage by the defendant is clear. No meaningful unilateral threat, express or implied, could be made to Transitron to require that company to purchase the products of Liquid Carbonic. The total sales of Transitron to all customers were $47,753,064 (1960), $37,059,866 (1961) and $28,831,539 (1962).[110] For the same years, its sales to General Dynamics were $491,373, $396,958 and $158,303.[111] Transitron's purchases of carbon dioxide and other industrial gases from Liquid Carbonic were $31,628 (1960), $134,684 (1961) and $444,596 (1962).[112]

Transitron was apparently purchasing from Liquid Carbonic to generate sales to General Dynamics. The impetus for the realization of that goal was to be the intervention of Liquid Carbonic on behalf of Transitron with its sister divisions. The record indicates that Liquid Carbonic did contact Convair which undertook "an accelerated program to qualify Transitron items" so that more business could be awarded to that company.[113] However, following this incident, the relationship became less harmonious. After Transitron received what it considered ill-treatment at the hands of Stromberg-Carlson, the defendant was informed that unless the situation improved, purchases of carbon dioxide and other industrial gases would be made elsewhere.[114]

Transitron and the defendant were engaged in a "mutual patronage" arrangement, each agreeing to buy from

106. GX 199, p. 3.

107. See discussion of law infra.

108. F.T.C. v. Consolidated Foods, 380 U.S. 592, 594, 85 S.Ct. 1220, 14 L.Ed.2d 95 (1965).

109. GX 162.

110. See Exh.B, p. 419 of defendant's memorandum in support of its motion to dis-

miss (the court has checked the figures and takes judicial notice of their accuracy).

111. GX 177, appendices G & L, p, 311.

112. Ibid.

113. GX 102, Doc. No. 09473.

114. GX 106, Doc. Nos. 09444–45.

the other in return for increased sales. Leverage, upon which the Special Sales Program primarily relies, is absent here. Nonetheless the practice is looked upon with disfavor, for it reflects the use of purchasing power to generate sales.[115]

As will be explained subsequently, for the practice to be unlawful however, a not insubstantial amount of trade must be foreclosed. Direct or circumstantial proof must be presented to show the existence of particular contracts involving a given amount of business. Even assuming [116] that the court could infer the existence of some contracts from the fact that reciprocity discussions occurred with Transitron and were apparently at least partially productive, no dollar amounts, on the evidence presented, could be ascribed to the unlawful agreements. This being the case, the government has failed to prove that the relationship in issue was violative of Section 1 of the Sherman Act.

Considering next, the case of Raytheon Co., the government has proven that leverage was applied by the defendant against that corporation. However, the government's claim that the amount of business foreclosed totaled $340,736 for the year 1962 alone is without foundation. To understand the problems as to the amount of commerce effected, a recitation of the underlying facts concerning the negotiations between the two corporations should prove helpful.

That the opportunity to use reciprocity existed is indicated by the following statistics. For the years 1960, 1961 and 1962, Raytheon purchased $235,768, $228,948 and $230,556 of carbon dioxide and other industrial gases from Liquid Carbonic.[117] Raytheon's sales to General Dynamics for the same years were $2,868,936, $10,561,706 and $11,566,510.[118]

It is apparent that the defendant attempted to use this potential to generate sales. As the first step towards this end, a meeting was arranged for October 14, 1958 between Pace and a high official of Raytheon.[119] So Pace might be fully prepared to present the defendant's sales "package", a telegram from C. R. MacBride to Mathey requested all information of General Dynamics' purchases from Raytheon.[120]

The next relevant exhibits in evidence describe visits by Jung to various plants of Raytheon in the Boston, Massachusetts area. Thus a notation in Jung's diary for October 20, 1960 indicates that he visited the Raytheon Missile Systems Division at Waltham, Massachusetts on that date. However, the General Manager of the plant was engaged in other matters when Jung arrived, and a suggested alternative meeting with a purchasing agent was rejected by Jung, who explained in his diary: "I decided against contact with the Purchasing people at this time, so I bowed out and made arrangements to meet the Vice President in charge of Sales in the Corporate Office."[121]

It should be noted that this arranged contact with the Vice-President of Sales is meaningful as consistent with the reciprocity approach. While the purchasing personnel at Raytheon could be expected to react negatively to reciprocity overtures, the persons in charge of sales would be more receptive in the face of a possible curtailment of purchases by General Dynamics.

The next visit of Jung occurred on October 24, 1960, this time to the "Corporate Office" in Waltham. He was at that time assured that the defendant's "cause" would be aided by the Sales Department if such assistance became necessary. Jung was then introduced to Wilson, the Corporate Director of Procurement, who apparently had been told of the treatment to

---

115. See discussion of "Reciprocity" infra at pp. 64–72.

116. See text infra at pp. 94–6.

117. GX 162.

118. GX 177, appendices G & L, p. 256.

119. GX 60, Doc. No. 16550.

120. Ibid.

121. GX 91, visit of October 20, 1960 to Raytheon.

be afforded to Liquid Carbonic. Jung relates Wilson's position as follows: "He stated that their relationship between (sic) both their present suppliers, namely, Linde and Airco, was extremely good and that he would have to be allowed to commit surgery in his own way. This indicates of course however, that he realizes that surgery must take place." Jung then asked about a bid that Liquid Carbonic was preparing to submit to Raytheon's Wayland, Massachusetts plant. Wilson suggested that they "work at one thing at a time". Two days later Jung called Wilson to, as Jung describes it, "press for this substantial amount of business." Wilson promised to check into the matter immediately.[122]

On November 4, 1960 Jung called on the Wayland plant. This visit was apparently fruitful for the defendant because the account was marked "Sold".[123]

On another occasion Wilson told Jung that Raytheon was considering building a new plant in Winsted, Connecticut. If the plant was constructed, Jung was assured that Liquid Carbonic would be the prime supplier.[124]

From what has been said thus far, it is apparent that some of the purchases of carbon dioxide and industrial gas made by Raytheon were certainly not the product of free choice. However, the problem arises as to which particular purchases suffer from this deficiency. The government's figure of $340,736 represents the total purchases of all Raytheon divisions from Liquid Carbonic. At the time there were nine purchasing locations of Raytheon.[125] The major location was in San Francisco.[126] The evidence as to reciprocal dealings is focused wholly on the Waltham and Lexington, Massachusetts plants. The record is devoid of any figures indicating the precise amounts

of purchases for these points. Yourish, the Liquid Carbonic Northeastern Manager, estimated that the New England plants of Raytheon account for $30,000 of business annually.[127] The New England area, however, embraced more than the Massachusetts locations, thus rendering this figure of limited value for present purposes.

The record does show that Yourish listed $7,350 of business secured by the Special Sales Program from the Waltham location as of April 15, 1959.[128] In addition, a letter from Yourish to a purchasing agent of Raytheon, dated October 18, 1962, indicates that a contract was negotiated by the terms of which Liquid Carbonic was to supply all of Raytheon's carbon dioxide requirements at its plants in the Metropolitan Boston area. While the full period covered by the agreement is unclear, the contract was to be effective for at least two years. The unit price was $65 per ton. This price represents one of the few instances where an account pressured by reciprocity, agreed to pay a premium for the defendant's product. As Yourish explained to Jung: "This business was resolved as indicated, despite the fact that Thermice had quoted a firm $60 per ton price for five years." [129]

The previously mentioned November 4, 1960 visit by Jung to the Wayland plant is another instance where the reciprocity approach apparently obtained results, for the notation immediately adjacent to the diary entry recording the visit states, "Sold".

Directing attention initially to the $7,350 figure, its mere entry on the corporate books as business secured by the Special Sales Program is not sufficient proof to establish that the sale in question was actually obtained by reciproc-

---

122. GX 91, visit of October 24, 1960 to Raytheon.

123. GX 91, visit of November 4, 1960 to Raytheon.

124. Ibid.

125. See N. 118 supra.

126. Ibid.

127. TR. p. 1302 (Yourish).

128. GX 128, Doc. No. 23465.

129. DX U.

ity.[130] Since no all embracing agreement between the two companies has been shown, or may legitimately be inferred, the government must show that reciprocity contacts caused the $7,350 sale. The only document in evidence as to the use of reciprocity which predates the acquisition of this business is the scheduled meeting of Pace with a Raytheon official at an undesignated location. This alone is insufficient to support the conclusion that the government urges. There is a failure of proof as to the causal connection between the Special Sales Program and the $7,350 sale.

A related problem is encountered in considering the $65 per ton contract. The actual purchases of Raytheon, if any, under this requirements contract, are not disclosed by the record. Therefore no conclusion can be reached as to the amount of commerce adversely affected by the contract. Similarly with reference to the November 4, 1960 visit, problems of causation are present. The notation "Sold" is without further explanation. No designation of price or the number of units sold is provided. Therefore again no particular dollar volume of business can be attributed to this reciprocity contact.

These failures of proof are not remedied by the previously quoted response of Wilson to the reciprocity efforts of Jung: "What do you want, blood? You already have 95% of our $CO_2$ business." [131] The reliability of this 95% figure is tainted by the fact it was stated when the speaker was aggravated and objecting to what he considered excessive business being given to one supplier. Under these conditions, exaggeration could be expected.

But more importantly, the percentage without further explanation, is of little value. The court does not know if it relates to one plant, the Boston area, the Northeastern region, or to all the plants of Raytheon. Thus the court can make no determination of the amount of business involved.

Along the same lines, the statement by Jung, viz., "we have proven, with the example of—Raytheon, just how profitable this program can be",[132] while probative, is not of sufficient specificity to cure the deficiencies in the record.

With reference to Standard Oil of California, the relationship between that company and Liquid Carbonic was similar to the one in existence with Transitron. The purchases by Standard Oil from Liquid Carbonic were not prompted by pressure, but rather are attributable to an agreement, which apparently was mutually agreeable, calling for each company to purchase certain products from the other.[133] Thus a regional sales report, dated August 29, 1960 explains a notation referring to Standard Oil as follows: "It should be noted that Standard Oil—which is the biggest listing on the attached—was not strictly the product of SSP program—but rather a local gain based on exchange of business here." [134] The amount of business se-

---

130. As noted previously, the court has found that the figures compiled from the regional sales reports are credible as general approximations. However, no such credence can be given to any particular entry. It is certainly conceivable that a regional reporter might, on occasion, simplify his task of compiling such data by automatically listing products sold to "Special Sales Program" designated accounts as business secured by the program, without actually concerning himself with the question of causal connection.

131. See N. 75 supra.

132. GX 95, p. 2.

133. Note should be taken of the fact that unlike the situation with Transitron, the potential for the use of leverage existed here because the purchases of carbon dioxide by Standard Oil are considerably less than that company's sales to General Dynamics. See GX 177, appendices G & L, pp. 284, 284(a). The fact that Standard Oil's annual sales figure exceeds two billion dollars does not eliminate the potential, it merely reduces the likelihood that its utilization would be successful. See N. 110 supra at B–384.

134. GX 148, Doc. No. 08832. The court accepts the notation of the regional sales manager as accurately describing the

cured was 3,750,000 pounds. No per unit price is provided. However, other documents in evidence indicate that the price was approximately 4¼ cents per pound.[135] The dollar amount involved is thus in the neighborhood of $159,375. The court finds that this business was obtained by the defendant's use of reciprocity.

With reference to Shell Oil, the sales to General Dynamics by that company were $825,173 (1960), $1,107,145 (1961) and $658,512 (1962).[136] Its purchases of carbon dioxide and other industrial gases from Liquid Carbonic for the same years were $43,091, $37,173 and $91,008.[137] Leverage potential was therefore present.

Like Standard Oil of California, the total sales of Shell Oil to all customers at the time in question was around two billion dollars.[138] However, unlike Standard Oil, Shell Oil, despite its size, was apparently linked to the defendant by coercive reciprocity. Thus Jung, in reporting a call to the Shell Office in New York on July 18, 1960 states: "These people very much aware of importance of TR. They apologized for giving their ice business in San Francisco to Cardox but explained that Cardox buys petroleum for their Ventura plant from Shell and they had no choice. When they cut us off in San Francisco however, they gave us Houston instead at 420,000℔ per year so they feel we were more than compensated." [139] The

court finds that the 420,000 pounds of carbon dioxide were sold by the defendant as the result of reciprocity. A per unit cost of 4¼ cents is derivable from the record.[140] The dollar amount of the sale was therefore $17,850.

In the Fall of 1959, another reciprocity sale was made with the Shell Plant in Houston. The negotiations are outlined in an intra-corporate speech given in September, 1959 by a regional sales manager of the defendant who stated: "A few weeks ago we went in to see the purchasing agent of Shell Oil in Houston * * *. We made tactful reference to the $630,000 our record shows G.D. spent with Shell Oil last year; he made some remark about that sort of talk creating problems from his side of the desk, but he promptly referred to his own record * * * and said we were wrong about the $630,000—it was actually $744,000 and, furthermore, during the same period Shell spent less than $20,000 with G.D. He agreed that left a rather wide gap and said he would check the situation on the present supplier and for us to see him later. I called back in two weeks and left with a purchase order for their ice requirements which are around 250,000℔ per year. I think Emory and Bill Dickson were having some conversations with Shell in New York about the same time so perhaps the call in Houston was not unexpected but we could not have asked for a better reception." [141]

---

transaction. This entry is unlike the $7,350 notation made with reference to Raytheon. See N. 130 supra. The present entry is accompanied by an explanation of the underlying sales negotiations. While fabrications in reporting probably are not uncommon, it is unlikely that false entries would be specifically mentioned in a covering letter as happened here.

As to the reciprocity involved being based on mutual patronage, see GX 239, an intracorporate Standard Oil of California memorandum which states in part: "In light of the successful acquisition of General Dynamics' petroleum business this date, we recommend the following CO$_2$ allocation at El Segundo: Liquid

Carbonic 75%." GX 173 indicates that the recommendation was followed and a contract for the purchase of carbon dioxide was made. However, the amount of business involved is not in the record.

135. See TR. p. 267 and exhibits cited therein.

136. GX 177, appendices G & L, p. 274.

137. GX 162.

138. See N. 110 supra at B-370.

139. GX 91, visit of July 18, 1960 to Shell Oil.

140. See TR. p. 267; GXs 150, 144.

141. GX 170, pp. 2-3.

The sale is confirmed by a salesman's report from Houston which lists the 250,000 pounds in question as secured by the Special Sales Program.[142] However, a perusal of the record does not provide a per unit price. The court may not judicially notice a likely minimum price to cure this deficiency. Therefore no dollar amount can be ascribed to this reciprocity sale.

The government's case as to Sylvania Electric Products, Inc. and Midland-Ross Corp., assuming the presence of improper contracts on condition, suffers from the same difficulty as was present with Transitron and Raytheon, viz., the actual amount of business foreclosed. The evidence simply does not permit this question to be answered.

The use of reciprocity by the defendant was most evident in its dealings with the six companies just considered. As to those companies, the government has proven that $177,225 of trade was unreasonably restrained. The court has perused the situation relative to the remaining three hundred and fifty-three companies which the government considers as major Special Sales Program accounts. The analysis indicates that no additional amounts of commerce have been restrained by particular vendor contracts.

There remains the findings of fact relative to the question of whether the merger itself is violative of Section 1. The court has found that there was a bilateral intent, at the time of the merger, to foreclose competition by the use of reciprocity. The only issue remaining for determination is the amount of commerce effected.

As the court has indicated previously, it accepts the defendant's statistics and the statements of its officers, both of which indicate that a significant amount of commerce was foreclosed by the Spe-

cial Sales Program. The defendant's penchant for not keeping records of reciprocity matters prevents a precise "dollar amount" finding. However, it is clear that the amount involved is "not insubstantial".[143]

The court's major findings of fact are concluded. However, a few minor findings are interspersed with the court's discussion of the applicable law.

## CONCLUSIONS OF LAW

## CONGLOMERATE MERGER

■ The merger in question is conglomerate in nature.[144] This term is best defined negatively, as one in which the merged firms are neither competitors nor potential or actual customers or suppliers of each other.[145] The merger of competitors constitutes a horizontal merger, while the union of a firm with a customer or supplier is termed a vertical merger.

The Congress has defined a conglomerate merger as "those in which there is no discernible relationship in the nature of business between the acquiring and acquired firms." [146]

■ A conglomerate merger, standing alone, is innocuous from an antitrust standpoint. The merger between Liquid Carbonic and General Dynamics is before the court because it created an opportunity for the defendant to increase sales via the use of reciprocity.

Although distinct, a conglomerate merger does bear some semblance to its vertical counterpart. The danger to competition posed by a vertical merger is found in the probability that the union of previously independent supplier and customer companies will preclude competitors from selling to the csutomer company or buying from the supplier company. Viewed in the short run at least, the vertical merger is more restric-

142. GX 71B, Doc. No. 10993.

143. See text infra.

144. The merger also resulted in a vertical foreclosure of approximately $200,000 of business. See text p. 8 supra.

145. 72 Yale L.J. 1265.

146. H.R.Rep. No. 1191, 81st Cong., 1st Sess. 11 (1949).

tive of competition for its effects generally materialize almost immediately following the merger.

While the adverse effects of reciprocity on competition represents a relatively new area of judicial inquiry, the Supreme Court has indicated in F. T. C. v. Consolidated Foods, 380 U.S. 592, 594, 85 S.Ct. 1220, 14 L.Ed.2d 95 (1965) and in Brown Shoe Co. v. United States, 370 U.S. 294, 317, 82 S.Ct. 1502, 8 L.Ed. 2d 510 (1962), that conglomerate mergers are within the purview of Section 7 of the Clayton Act. The legality of contracts predicated on reciprocity under Section 1 of the Sherman Act is a question of first impression.

## RECIPROCITY

"Reciprocity" is not a word of fixed meaning. As used in the business community, it embraces a host of commercial practices, only some of which are relevant for present purposes.

In its broadest meaning, reciprocity describes the practice whereby a company, overtly or tacitly, agrees to conduct one or more aspects of its business so as to confer a benefit on the other party to the agreement; the consideration being the return promise in kind by the other party.[147]

A common subdivision of business reciprocity, and the one involved in the instant case, concerns reciprocal buying. Such an arrangement provides in essence that, "if you buy from me, I'll buy from you", or as an officer of the defendant described it, "you scratch my back and I'll scratch yours".[148] As thus defined, the practice covers a wide variety of relationships. The spectrum extends from the use of overt coercion to a mutual patronage agreement wholly without such overtones. The former obviously is "one of the congeries of anticompetitive practices at which the antitrust laws are aimed."[149] The question is whether the opposite end of the spectrum also represents prohibited conduct.

As a point of departure, it should prove helpful to review the statements made regarding reciprocity by Commissioner Elman of the Federal Trade Commission and Mr. Justice Douglas, writing for the Supreme Court, in the *Consolidated Foods* decisions.[150]

By way of background, *Consolidated Foods* involved the merger of that corporation, a wholesaler and retailer of foods, and Gentry, Inc., a manufacturer of dehydrated onion and garlic. At the time of merger, Consolidated Foods had assets of $60,000,000, while Gentry's

---

147. Edwards, "Conglomerate Bigness as a Source of Power", in Nat'l Bureau of Economic Research, Business Concentration and Price Policy (1955), 331, 342.

148. Consolidated Foods Corp., F.T.C. No. 7000, p. 4, November 15, 1962; GX 17.

149. F.T.C. v. Consolidated Foods, 380 U.S. 592, 594, 85 S.Ct. 1220 (1965).

150. Parenthetically, it should be mentioned that the Federal Trade Commission instituted three cases in the 1930's, pursuant to § 5 of the Federal Trade Commission Act, which prohibited "unfair methods of competition", in which the charges involved the coercive use of reciprocity. In the first two cases, Waugh Equip. Co., 15 F.T.C. 232 (1931) and Mechanical Mfg. Co., 16 F.T.C. 67 (1932), individuals connected with Armour & Co. and Swift & Co., respectively, acquired railway equipment manufacturing companies. Negotiating sessions followed, at which time the defendants indicated to the railroads that unless they purchaed their equipment from the defendants' manufacturing enterprises, a curtailment in the meat packers' shipments by the railroads' lines would occur. In the third case, California Packing Corp., 25 F.T.C. 379 (1937), the defendant was a packer of foodstuff. By the same "sales" approach employed in Waugh Equip. and Mechanical Mfg., California Packing forced suppliers and transport companies to patronize its subsidiary terminal corporation. These three cases, which all involve the forceful use of purchasing power to generate sales, represent the first governmental attempts to deal with the anti-trust problems created by reciprocity. However, they shed little or no light on the question of the legality of reciprocity arrangements in which neither participant possesses leverage, as was the case relative to Transitron.

assets totalled $1,600,000. Since many of the food processors which sold to Consolidated were also users of the products manufactured by Gentry, the stage was set for reciprocity. Moreover, the fact that the food processors typically made relatively small purchases of onions and garlic, as compared to the dollar volume of business secured from Consolidated, Consolidated had leverage. As found by Commissioner Elman, "Consolidated relied on the influence generated by its buying power to induce these processors to purchase onion and garlic from its Gentry Division." [151]

The Commissioner, in addressing himself to reciprocity, first notes that its coercive use had been termed an anticompetitive device by the Federal Trade Commission in three prior decisions, viz., Waugh Equipment Co., 15 F.T.C. 232 (1931), Mechanical Manufacturing Co., 16 F.T.C. 67 (1936) and California Packing Corp., 25 F.T.C. 379 (1937). Reference is then made to United States v. Griffith, 334 U.S. 100, 108, 68 S.Ct. 941, 946, 92 L.Ed. 1236 (1948), in which the Supreme Court said: "Large-scale buying is not, of course, unlawful per se. It may yield price or other lawful advantages to the buyer. It may not, however, be used to monopolize or to attempt to monopolize interstate trade or commerce. Nor * * * may it be used to stifle competition by denying competitors less favorably situated access to the market." Combining the three Federal Trade Commission cases, with the language from Griffith, the Commissioner concluded that "these decisions represent specific applications of the general principle that abuse of large buying power to restrict competitive market opportunities is illegal." [152]

Finally, the Commissioner held that given a corporate structure similar to Consolidated Foods', the anti-competitive effects can materialize without any effort on the part of the parent corporation. Food processors, which are present or potential suppliers of Consoli-dated, could easily appreciate the benefits of favoring Gentry. This being true, the mere presence of the power has significant anti-trust ramifications.

The question of what, if anything, is permissible reciprocity is not answered, directly, or by necessary implication, by the Commission's decision.

However, an analysis of the Supreme Court's opinion in Consolidated Foods, is more fruitful. On page 594 of 380 U.S. on page 1222 of 85 S.Ct. of that decision, Mr. Justice Douglas states: "Reciprocal trading may ensue not from bludgeoning or coercion but from more subtle arrangements. A threatened withdrawal of orders if products of an affiliate cease being bought, as well as a conditioning of future purchases on the receipt of orders for products of that affiliate is an anti-competitive device."

This statement, standing alone, certainly does not require the conclusion that mutual patronage reciprocity is within the ambit of the anti-trust laws. However, the statement does not stand alone. The supporting footnote quotes from a National Bureau of Economic Research publication: "Where large and powerful concerns encounter each other as seller and buyer, there is sometimes a reciprocal exchange of favors, by which each of the great enterprises strengthens the other. The most common form of such a relationship is probably reciprocal buying. A reciprocal buying arrangement may arise either through formal contract or through an informal understanding that may be scarcely distinguishable from a mere policy of cultivating the good will of a large customer. The essence of the arrangement is the willingness of each company to buy from the other, conditioned upon the expectation that the other company will make reciprocal purchases. The goods bought are typically dissimilar in kind, and in the usual case could be obtained from other sources on terms which, aside from the reciprocal purchases, would be no

---

151. Consolidated Foods Corp., No. 7000, p. 5, F.T.C.. November 15, 1962.

152. Id. at p. 11.

less advantageous. Where such a relationship is well established, it prevents the competitors of each company from selling to the other company, and affords to each company whatever increase in size and strength can be derived from an assured place as supplier to the other." [153]

The situation just described of "large and powerful concerns" exchanging "favors" exactly describes the relationships of the defendant in the present case, with Transitron and Standard Oil of California. By dictum then, the Supreme Court considers relationships of this nature unlawful, assuming the requisite amount of commerce has been effected.

To summarize this section, the actual or potential implementation of coercive reciprocity, which presupposes the existence of leverage, is inimical to a competitive economic society. "Mutual patronage" reciprocity, on the other hand, occurs when both parties stand on equal footing with reference to purchasing power *inter se*, yet agree to purchase from one another. While the former practice certainly is the more offensive, the latter arrangements are equally disruptive of the competitive processes "[Reciprocity] transforms substantial buying power into a weapon for 'denying competitors less favorably situated access to the market.' It distorts the focus of the trader by interposing between him and the traditional competitive factors of price, quality, and service an irrelevant and alien factor which is destructive of fair and free competition on the basis of merit. The efficient producer may thereby suffer loss because of circumstances extrinsic

to the worth of his product. In this situation, it is relative size and conglomeration of business rivals, rather than economic efficiency, that may determine firm growth and success, and ultimately, the allocation of resources." [154]

To appreciate the fact that competition suffers significantly from reciprocity, regardless of its form, consider the results achieved at Raytheon and Standard Oil by the defendant. With Raytheon, coercion was used to extract a promise that "surgery" would be committed of its then present suppliers, with whom it was well pleased, to accommodate Liquid Carbonic. At Standard Oil, after that corporation secured a contract from the defendant's Convair Division, an order was given to increase Standard Oil's purchases from Liquid Carbonic. In both instances, the operations of the competitive system were frustrated by a concentration of purchasing powers. [155]

A prohibition of coercive and non-coercive reciprocity practices is no more restrictive than the present checks on, *inter alia*, horizontal and vertical mergers and requirement contracts. When a sufficient volume of trade is concerned, a balancing of interests requires that the businessman's freedom of operation must be curtailed to prevent concentrations of economic power inimical to the public interest.

 This court finds that reciprocity, whether coercive in nature or based on mutual patronage, is an anti-competitive practice.

## SECTION 7 OF THE CLAYTON ACT INTRODUCTION

The primary purpose of anti-trust legislation in general was stated by Mr.

153. See N. 147 supra. Edwards quoted in F.T.C. v. Consolidated Foods, 380 U.S. 592, 594, N. 2, 85 S.Ct. 1220 (1965).

154. Consolidated Foods Corp., No. 7000, pp. 11–12, November 12, 1962.

155. See Hausman, *Reciprocal Dealings and the Antitrust Laws*, 77 Harv.L.Rev. 873, 885: "In reciprocity, coercion is not the gravamen of the injury to competition. A supplier who has no occasion to purchase the practitioner's product may be simply

cut off or ignored; threats are irrelevant. Yet the injury to competition is no less for the absence of bullying." But see, Handler, *Emerging Antitrust Issues*, 49 Virginia Law Rev. 433, 437: "Where * * * there is no coercion, we should leave to the market place and the processes of education the elimination of practices which may be unbusinesslike or uneconomic but are not demonstrably anticompetitive."

Justice Douglas in United States v. Columbia Steel Co., 334 U.S. 495, 536, 68 S.Ct. 1107, 1128, 92 L.Ed. 1533 (1948) (dissent), as follows: "In final analysis, size \* \* \* is the measure of a handful of men over our economy. That power can be utilized with lightning speed. It can be benign or it can be dangerous. The philosophy of the Sherman Act is that it should not exist. For all power tends to develop into a government in itself. Power that controls the economy should be in the hands of elected representatives of the people, not in the hands of an industrial oligarchy." [156]

The capitalistic system under which this nation has thrived rests on the premises that the hard hand of competition, unobstructed by citadels of private power of which Mr. Justice Douglas speaks, can most efficiently allocate the country's resources. See Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 605, 73 S.Ct. 872, 97 L.Ed. 1277 (1953).

■ Against this background, the particular spur which led to the passage of Section 7 of the Clayton Act was dissatisfaction with the Sherman Act. The Congress concluded after thirty odd years of experience with that statute, that further legislation was necessary. The Sherman Act operates "after the fact", that is, once monopolistic proportions have been obtained. The Clayton Act was intended by the Congress to eliminate anti-competitive practices in their incipiency before they reached the dimensions of Sherman Act violations. S.Rep. No. 698, 63d Cong., 2d Sess. 1 (1914). See also United States v. E. I. Du Pont De Nemours & Co., 353 U.S. 586, 589, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957); United States v. Bethlehem Steel Corp., 168 F.Supp. 576, 581–583 (S.D.N.Y.1958).

■ The point of inquiry therefore is the time of merger. The question is whether the reciprocity made possible by the merger gives rise to the probability that a substantial lessening of competition will occur. See F.T.C. v. Consolidatd Foods, 380 U.S. 592, 295, 85 S.Ct. 1220 (1965).

In this regard, it borders on the impossible to anticipate the number and scope of mutual arrangements that will come into being following a conglomerate merger. Even though many large firms may be vendors of General Dynamics, as well as users of carbon dioxide and other industrial gases, in the absence of a bargaining power edge, no pressure can be applied. Of course it is true, as previously discussed, that large firms not infrequently will reciprocally buy to "lock-in" sales. Viewed as of the time of merger however, there being no dominating spur to this type of reciprocity, its future presence or absence is difficult to gauge.

The situation is otherwise where leverage is present. The presence of power, without a countervailing check, often leads to abuse. However, even without the overt utilization of leverage, its mere presence may operate to artificially produce sales. United States v. Ingersoll-Rand Co., 320 F.2d 509, 524 (3d Cir. 1963). A major vendor of General Dynamics, which purchases a relatively small amount of carbon dioxide and other industrial gases, may be well advised from a business standpoint, to purchase these products from Liquid Carbonic. Indeed a potential vendor of General Dynamics might pursue the same course of conduct as part of a program of improving its sales presentation to General Dynamics. Even if the favoring of Liquid Carbonic only occurs when its product and price match those of a competitor, the practice perverts competition. See, e. g., F. T. C. v. Consolidated Foods, 380 U.S. 592, 594, 85 S.Ct. 1220 (1965); International Salt Co. v. United States, 332 U.S. 392, 396–

---

**156.** The quoted remarks were directed at concentrations of power in the steel industry. However, the underlying philosophy expressed of preventing economic power from centralizing in private individuals, is obviously applicable to other industries.

397, 68 S.Ct. 12, 92 L.Ed. 20 (1947). The competitor under such circumstances, can only prevail when his price is the lowest. No chance exists that a "flip of a coin" will resolve the matter in his favor in an equal bid situation.

The results of leverage reciprocity on competition are far more subject to prognosis than is the case for mutual patronage reciprocity. Moreover, this latter form of reciprocity is seen relatively infrequently in this case. Rather than unnecessarily confuse the issue, the subsequent discussion of the Special Sales Program in light of Section 7 of the Clayton Act will be confined to instances where leverage is present, thereby creating the potential for the exercise of coercive reciprocity.

The approach to be employed consists of an analysis of the power created by the merger, the likelihood of its implementation, and the probable competitive consequences of the resulting foreclosure.

### LEVERAGE

That the merger created the power to procure sales via the systematic application of purchasing power, is clear. The dollar volume of purchases by General Dynamics totalled approximately one-half billion dollars at the time of the merger.[157] Yet it sold the great bulk of its products to the United States government.[158] This state of events deprived the defendant of gaining any competitive advantage from its large scale purchasing power. The situation was remedied by the acquisition of Liquid Carbonic. This union permitted the purchasing power to be asserted against the vendors of the defendant who now used, for the first time in any significant degree, a product manufactured by General Dynamics.[159]

The dollar volume of sales by a vendor to General Dynamics, as compared to its use of carbon dioxide and industrial gases, is an important indicator of a "Special Sales Program" account's likely responsiveness to reciprocity. If the figures approach equipoise, the only reciprocity approach possible is one of mutual patronage. However, where the ratio indicates a disproportionate amount of sales relative to purchases, a distinct, and as indicated previously, a predictable threat to competition, is presented. The figures below are representative of the unfavorable power balance typically confronting a "Special Sales Program" account: [160]

| COMPANY | TOTAL SALES TO GENERAL DYNAMICS 1960–1962 | TOTAL PURCHASES OF GASES FROM GENERAL DYNAMICS, 1960–1962 | RATIO |
|---|---|---|---|
| A & M Castings, Inc. | $ 177,015 | $10,227 | 17 to 1 |
| ACF Industries | 141,407 | 6,890 | 20 to 1 |
| AMP Inc. | 2,281,189 | 3,294 | 693 to 1 |
| Accurate Rubber Co. | –0–* | 2,574 | ------ |
| Ace Electronics | 173,924 | 235 | 740 to 1 |
| Acme Electric Co. | 133,662 | 854 | 156 to 1 |

* Sales of less than $10,000 per year are not reported in the vendor books.

———◆———

The court finds that leverage was created by the merger. As discussed previously, the court has rejected the defendant's argument that this power is

157. See N. 28, supra.

158. See N. 12, supra.

159. See GX 69, Doc. No. A30336, in which Mathey states: "Trade relations with various concerns have never meant anything to our other divisions. We are the single division that can use those relations."

160. GX 162.

neutralized by ASPERS and a lack of inter-divisional cooperation.

## PROBABLE IMPLEMENTATION OF LEVERAGE

Preliminarily it might be questioned whether it is realistic to expect a corporation possessing a competitive advantage not to attempt to reap the potential benefits. Reciprocity is a common business practice, the roots of which reach at least as far back as the beginning of the industrial revolution.[161] In fact, common sense suggests that its roots are contemporaneous with the beginning of commercial activity. Almost everyone, it seems, prefers "to do business with friends." Of course this practice is perfectly lawful, unless the efforts of a practitioner reaches such proportions as to significantly interfere with the functionings of the economic system. In any event, the practice being prevalent in the business community, its implementation can be expected. Even if this were not the case, and restraint could reasonably be hoped for, the public would best be served by eliminating the temptation.

As indicated above, the question of whether reciprocity power will be used seems self-answering. However, in the instant case, this intrinsic improbability of the power remaining dormant is reinforced by other evidence in the record.

Both parties had the intent at the time of merger to use the purchasing power of General Dynamics to secure sales for Liquid Carbonic. The Supreme Court stated in Brown Shoe Co. v. United States, 370 U.S. 294, 329, n. 48, 82 S.Ct. 1502, 1526, 8 L.Ed.2d 510 (1962): "Although it is 'unnecessary for the Government to speculate as to what is in the back of the minds' of those who promote the merger * * *, evidence indicating the purpose of the merging parties, where available, is an aid in predicting the probable future conduct of the parties and thus the probable effects of the merger." See also United States v. Aluminum Co. of America, 233 F.Supp. 718, 727–729 (E.D.Mo. 1964).

In this regard consider Nicholson's motto: "If you think, you can."[162] This motto succinctly states the expected positive correlation between the intent to use reciprocity and the results of the Special Sales Program.

Considering now the pre-merger anti-competitive conduct of Liquid Carbonic, the Supreme Court has indicated in United States v. Aluminum Company of America, 377 U.S. 271, 277, 84 S.Ct. 1283, 12 L.Ed.2d 314 (1964), and Brown Shoe Co. v. United States, supra, 370 U.S. at 332, 82 S.Ct. 1502 that such practices are probative of the likelihood of similar conduct occurring in the future.

Liquid Carbonic has a long history of anti-trust violations. In 1948, the Federal Trade Commission issued a cease and desist order against that corporation and its principal competitors prohibiting them, *inter alia,* from price fixing, predatory pricing to eliminate competitors and allocating territories with competitors.[163] Also in 1948, the Department of Justice instituted suit against Liquid Carbonic, charging them with a conspiracy to restrain trade in the carbon dioxide market. This action was concluded by a consent decree on March 7, 1952.[164] On December 22, 1960, following a grand jury investigation in the Southern District of New York, the government instituted a criminal contempt action in which General Dynamics (which had by then acquired Liquid Carbonic) and its three principal competitors were charged with violating the 1952 consent decree by conspiring to fix the price of carbon dioxide and by interfering with the business of smaller competitors.[165] General Dynamics pled guilty to this charge and was fined $75,-

---

161. Hausman, N. 155 supra at pp. 873–79.

162. GX 160, p. 3.

163. GX 175.

164. GXs 18, 19.

165. GX 19.

000.[166] Two Liquid Carbonic officials, Nicholson and Mathey, pled *nolo contendere* and were fined.[167]

The relevance of past violations was well stated by Mr. Justice Cardozo in United States v. Swift & Co., 286 U.S. 106, 116, 52 S.Ct. 460, 463, 76 L.Ed. 999 (1932): " * * * size carries with it an opportunity for abuse that is not to be ignored when the opportunity is proved to have been utilized in the past."

Post acquisition evidence indicates that the power has been used. The Special Sales Program is, as explained by an officer of the defendant, a "substitute for the less desirable term of reciprocity * * *."[168] This highly systemized program was designed to exploit the sales generating capacity latent in the defendant's purchasing power.

■ The court finds that the defendant intended, and did, use the reciprocity power created by the merger. The remaining issue is whether competition will be substantially lessened as a result.

### SUBSTANTIAL LESSENING OF COMPETITION

The threshold question in this section of the decision is amount of foreclosure which the defendant's activities could be expected to achieve if unchecked.

Viewing the problem from a purely theoretical vantage point, the potential foreclosure embraces the total use of carbon dioxide by all the actual and potential vendors of General Dynamics. While this represents the utter limits, attaching a dollar amount to this potential, even in the approximate, is obviously impossible. Among the reasons for this impossibility are the possible reciprocity pressures being asserted from other quarters against present or future "Special Sales Program" accounts, plus the unknown carbon dioxide requirements of potential vendors. The only realistic approach is to confine the discussion primarily to the three hundred and fifty-nine companies considered by the government as major accounts. The periphery of potential foreclosure was mentioned only to emphasize that the court's conclusion as to the probable effects of the program on competition are by necessity, conservative.

As has been noted, the total sales of carbon dioxide by the defendant to major accounts were $3,189,325 (1960), $3,448,668 (1961) and $3,542,888 (1962). The 1962 sales figure represents 17.4% of Liquid Carbonic's sales of carbon dioxide for that year. It also is 6.6% of the total sales in 1962 of the six largest carbon dioxide distributors, and roughly 5% of the year's total sales of all distributors.[169]

While certainly not every sale in the $3,542,888 total was made, or assured, by the presence of reciprocity, the figure does indicate, in a rough fashion, the dimensions of the potential involved. Moreover, it should be mentioned that the 1962 sales figure represents the actual, not the potential, sales to major accounts. Unlike the proof in F. T. C. v. Consolidated Foods, supra, the present record is devoid of evidence indicating the total use of the defendant's vendors of the "pushed" product. In *Consolidated Foods,* the figure was 25% which as Commissioner Elman notes was "exceptionally large".[170] It is doubtful that the corresponding percentage in the present case would approach that level. However, it certainly would far exceed the 5% figure represented by the 1962 sales figure. The program at that time was still in its infancy. Many of the three hundred and fifty-nine companies apparently had not received a reciprocity "visit" as of that time.[171]

The amount of unexploited potential is evidenced by the following statements of the defendant's officers. Mathey

166. GX 20.

167. GXs 21, 22.

168. GX 84, p. 2.

169. See n. 102 supra.

170. Consolidated Foods Corp., F.T.C. No. 7000, p. 19, November 15, 1962.

171. The record contains no evidence of contacts under the Special Sales Program with 115 companies.

stated in early 1959 that: "The single most powerful tool we have for increasing our business is to sell our products to the companies that enjoy business from other divisions of General Dynamics."[172] In late 1959 or early 1960 he stated: "I think our success in 1960 depends very largely on how well or poorly we exploit the possibilities of the SSP program * * *."[173] In a speech given sometime after mid-1959, Mathey explained: "The Special Sales Program with which you are all familiar offers great promise. Already our sales through this program figure in the millions of dollars per year—and we have hardly made a dent in that potential market."[174] In early 1961, Jung states, "As I see it, our Special Sales Program offers our Company and every salesman in it a really powerful advantage which, used properly, patiently, and effectively could easily generate 5 million dollars in new business over the next two years."[175] Jung, in late 1961 or early 1962, expresses a similar thought somewhat more poetically: "The deeper we dig, the more effort we expend, the more gold we find."[176]

The next question is whether the amount of commerce which probably will be adversely affected by the defendant's reciprocity program is sufficient to support the conclusion that the program will substantially lessen competition. For purposes of this discussion, the court adopts the most conservative estimate of the probable foreclosure possible under the circumstances, viz., 5%.

To determine if this amount of foreclosure brings the merger within the prohibition of Section 7, requires an analysis of the carbon dioxide market. As noted previously, at the time of the merger four firms controlled 75% of the market, while two firms, viz., Liquid Carbonic and Air Reduction Company, accounted for 60% of the total sales of the product. This latter percentage is of prime importance for in United States v. Aluminum Company of America, 377 U.S., supra at 279, 84 S.Ct. 1283, United States v. Philadelphia National Bank, 374 U.S. 321, 365, n. 42, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963) and Brown Shoe Co. v. United States, supra, 370 U.S. at 331, 82 S.Ct. 1502, the rule was enunciated that the higher the level of market concentration, the more suspect a given amount of foreclosure becomes. Thus a 5% increase in concentration in a market served by multiple distributors may not cause alarm, whereas the same percentage in a market already highly centralized is unlawful. The carbon dioxide industry is an oligopoly. As is not uncommon in such an economic environment, the industry has been plagued by partial breakdowns in the competitive processes in the past. This is evidenced by the prior anti-trust violations charged against some of its firms.

In *Philadelphia National Bank,* the horizontal merger under attack represented a foreclosure of 30% of the market. The Supreme Court, after taking care to indicate that it was not providing a minimum guideline for what is "undue concentration", held that 30% certainly fell within that categorization. At the time of the merger Liquid Carbonic controlled approximately 35% of the market. There is a probability that a minimum of a further 5% would be added to that market share if the Spe-

172. GX 69, Doc. No. A30337.

173. GX 84, Doc. No. 22290.

174. GX 160, Doc. No. 22305.

175. GX 93, Doc. No. 16430.

176. GX 161, Doc. Nos. 24082–83.
 The above statements of the defendant's officers relate to both carbon dioxide and other industrial gases. The former is the stipulated line of commerce under the Section 7 charge. Thus an adjustment of the figures contained in the statements is in order. GX 162 indicates that the sales figures for carbon dioxide and for other industrial gases, were approximately equal for 1960, 1961 and 1962. Therefore the required adjustment can be made by dividing the figurs, viz., "millions of dollars" and "5 million dollars", by two.

cial Sales Program were permitted to continue in operation. While each anti-trust case is to a degree *sui generis*, it is clear to this court that the pre-merger condition of the carbon dioxide industry was "unduly concentrated". This being the case, "the importance of preventing even slight increases in concentration and so preserving the possibility of eventual deconcentration is * * * great". Philadelphia National Bank, supra at 365, n. 42, 83 S.Ct. at 1742.

In United States v. Aluminum Company of America, supra, the industry involved was highly concentrated, with the leading two firms controlling 50% of the market. The court on that occasion, explicitly relying on *Philadelphia National Bank,* held that although the acquisition in question added only 1.3% to the defendant's control of the relevant line of commerce, it was violative of Section 7.

The *Aluminum Company of America* case involved a horizontal merger, in which a given percentage of market foreclosure occurs at the instant of merger. With a conglomerate merger, of course, the actual foreclosure can not be calculated immediately. Any conclusion in this regard can only be couched in probabilities. Bearing this in mind, the court very cautiously arrived at a 5% figure of expected foreclosure. This conservative estimate of course falls far short of the opinions expressed by the defendant's officers.

The court concludes that the foreclosure involved in the instant case holds every promise of being at least three times the 1.3% involved in *Aluminum Company of America*. The carbon dioxide industry is already excessively concentrated. The 5% involved is more than the "slight increase" condemned by dictum in *Philadelphia National Bank* and by the holding of *Aluminum Company of America*.

The government has proven that the merger of Liquid Carbonic and General Dynamics is reasonably likely to result in a substantial lessening of competition in the carbon dioxide mar-ket. The charged violation of Section 7 of the Clayton Act has been established.

## SECTION 1 OF THE SHERMAN ACT
### INTRODUCTION

The legality of the use of reciprocity under Sherman § 1 is a question of first impression. The government contends that contracts made by the defendant with certain reciprocity accounts, as well as the merger agreement itself, are violative of the Section. These contentions will be considered separately.

While the general areas of inquiry are unique, the court is not without guidelines. Those who have had occasion to consider the use of reciprocity as an anti-competitive practice have invariably analogized it to "tying-in" agreements. See e. g., Consolidated Foods Corp., F.T.C. No. 7000, pp. 12–13, November 15, 1962; Hausman, "Reciprocal Dealings and the Antitrust Laws", 77 Harv.L.Rev. 873, 883 (1964); Handler, "Emerging Antitrust Issues: Reciprocity, Diversification & Joint Ventures," 49 Va.L.Rev. 433, 437 (1963). The court finds, for reasons to be discussed shortly, that the analogy is sound. It therefore adopts for purposes of this case, the standards of decision delineated by the Supreme Court in those cases.

"Tying-in" occurs when the sale of one product (the tying product) is conditioned on agreement to purchase another (the tied product). "Where such conditions are successfully exacted competition on the merits with respect to the tied product is inevitably curbed. * * * They deny competitors free access to the market for the tied product, not because the party imposing the tying requirement has a better product of a lower price but because of his power or leverage in another market." Northern Pacific Railroad Co. v. United States, 356 U.S. 1, 6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958).

Similarly in the instant case General Dynamics, via the Special Sales Program, "ties" its purchases from a present or prospective vendor to that vendor's

purchases of carbon dioxide from Liquid Carbonic. By so acting, the defendant manages to succeed in the carbon dioxide market, not because it has "a better product or a lower price" but because of its purchasing power as a defense contractor. This transference of purchasing power to inflate sales in other markets accomplishes the same result condemned in "tying-in" arrangements, viz., a frustration of competitive criteria in determining which firms receive which purchasing orders.

Few would dispute the above analogy with reference to coercive reciprocity. However, at least one prominent commentator in the anti-trust field has questioned the analogy's applicability to mutual patronage reciprocity. See note 155, supra (Handler). For a "tying-in" arrangement to be consummated, there must be a strong demand for the tying product. If this is not the case, the would-be customer might well elect to purchase neither the tying nor tied product. In other words, without power in one market which can be transferred to interfere with a purchaser's freedom of choice in a second market, tying is impossible. With mutual patronage reciprocity, on the other hand, purchasing power is used by both parties as a sales generating device, although no force is exerted from any quarter.

If anti-trust legislation was designed primarily to insulate customers from abuse, the "tying-in" analogy would be without merit with reference to non-coercive reciprocity. However, this is not the case. The legislation is intended to preserve free competition. Reciprocity, whether mutual or coercive, serves to exclude competitors by the exercise of large scale purchasing power. This court concludes that the analogy of reciprocity to "tying-in" arrangements applies to both forms of reciprocity.

The Supreme Court has held that "tying-in" arrangements are *per se* violative of Section 1, if a not insubstantial amount of commerce is effected. Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953); International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947). In *International Salt* the court indicated that the test of substantiality depends on absolute, not relative, foreclosure. In that case $500,000 was found to be a "not insubstantial" amount.

Again this background, attention is now directed to the government's position regarding vendor contracts. The thrust of their argument is that reciprocity was systematically interjected into the sales presentations of Liquid Carbonic. It is pointed out that the statistics and statements of the defendant indicate that the program was effective. Therefore, the court is urged to infer the existence of contracts in restraint of trade.

Such a conclusion is not warranted. The Section's reference to contracts, combinations and conspiracies, is necessarily directed at bilateral arrangements. The statistics which the government mentions have been found by the court to be credible. Nonetheless, the business secured could be the result of the mere presence of the reciprocity power. United States v. Ingersoll-Rand Co., 320 F.2d 509, 524 (3d Cir. 1963). Vendors of General Dynamics to curry favor or protect present sales to the defendant, might unilaterally decide to purchase the products of Liquid Carbonic. In such instances, no actual contacts would occur and thus no agreements would be present to serve as a predicate for a Sherman § 1 violation. This is true even though if a sufficient volume of trade was diverted in this fashion, a Clayton § 7 violation would be established.

To prove the presence of vendor contracts on condition, particular contracts with identifiable parties must be introduced into evidence, or legitimately inferred from the conduct of such identifiable parties. This was done by the government but the total amount of proven restrained trade totalled only $177,225. The $500,000 in *International Salt* has no magical significance; it

merely was termed by the court as "not insubstantial". However, it is the lowest figure so designated by the court to date, in situations analogous to the present case. Since the government has proven the other prong of the Sherman § 1 case, viz., that the merger itself is violative of the statute, this aspect of this case is an inappropriate vehicle for finding an amount considerably less than $500,000 as "not insubstantial". Thus the government has failed to prove the illegality of the challenged vendor contracts.[177]

The next subject for the court's considerations is the legality of the merger relative to Section 1. The court has found that both parties had the intent, at the time of merger, to employ the anti-competitive device of reciprocity to generate sales. The defendant's statistics and the statements of its officers clearly demonstrate, as indicated previously, that a "not insubstantial" amount of commerce was effected as a result of the merger agreement. The court therefore finds on this aspect of the case that the government has satisfactorily carried its burden of proof.

The final question concerns the appropriate relief to be ordered. As noted previously, the mere presence of reciprocity power may have significant anti-trust consequences. This fact alone indicates the need for divestiture. See Consolidated Foods Corp., F.T.C., No. 7000, pp. 26–8, November 15, 1962. Moreover, in United States v. E. I. Du Pont De Nemours & Co., 366 U.S. 316, at 326, 328, 81 S.Ct. 1243, at 1250, 6 L.Ed.2d 318 (1961), it was noted that divestiture, "that most drastic, but most effective, of antitrust remedies" is "peculiarly appropriate in cases of stock acquisitions which violate § 7."

The court directs that the defendant divest itself of Liquid Carbonic by severing all common ties of ownership and management.

The defendant is also ordered to cease and desist, from the date of this decision, from using reciprocity to secure sales of carbon dioxide or other industrial gases.

The plaintiff is ordered to submit to the court within 60 days of the filing of this decision, a plan for divestiture, mutually agreeable to the plaintiff and the defendant, which will implement the court's order. If agreement cannot be reached, the plaintiff will submit its proposed judgment on the above date. Thirty days thereafter, the defendant will submit its counter proposals.

So ordered.

---

177. In the court's decision at the close of the government's case, the defendant's motion to dismiss as to this aspect of the case was denied. However, after having heard all the evidence, the court finds as stated above.